JUDGE GOFER
delivered the opinion or the court.
Having been convicted of the murder of E. D. Kennedy, and adjudged to be confined in the penitentiary for the balance of his natural life, the appellant has appealed to this court for a reversal of that judgment.
Numerous grounds are relied upon for reversal, which we proceed to notice seriatim :
1. For some reason, not disclosed by the record, the jury, *343 by which the appellant was tried, was not summoned by the sheriff of the county, but by James N. Denny, who is styled “ special sheriff,” and his assistants E. W. Harris and W. A. Arnold.
Section 193, Criminal Code, provides that “ The court may, for sufficient cause, designate some other officer or person than the sheriff to summon petit jurors, the officer or person designated being first duly sworn in open court to discharge the duty faithfully and impartially.”
The record does not contain an order showing that Denny or either of his assistants was designated to summon jurors in the case, but it does contain an entry showing that they “took the oath prescribed by law in regard to summoning jurors in this casé” for the term.
No objection was made before verdict on account of the manner in which, or the persons by whom, the jurors were summoned. There is, we think, enough in the record to show that the person named as special sheriff and his assistants were designated by the court to summon the jury, and as the appellant and his counsel must have known by whom the jury was summoned, and by what authority the persons summoning the jury acted, and failed, until after the verdict, to make any objection to the jury on that ground, any irregularity in that respect was waived.
2. Among other grounds for a new trial it was alleged that one of the jurors was an alien, and that anothei’, before being accepted, had formed and expressed the opinion that the appellant was guilty, and that neither the appellant nor his counsel knew of the disqualification of either of said jurors until after verdict.
The court made no decision in regard to these jurors, or either of them, until it came to pass on the motion for a new trial, and any error the court may have committed in its ruling in respect to them was in overruling that motion.
*344 The decision of the court upon a motion for a new trial is not subject to exception. (Sec. 281, Crim. Code; Terrell v. Commonwealth, 13 Bush, 246.)
An exception in a criminal case “ shall be shown upon the record, by a bill of exceptions, prepared, settled, and signed, as provided in the Code of Practice in Civil Cases.” (Sec. 282, Crim. Code.)
As the appellant had no right to except to the order overruling his motion for a new trial, he had no right to have a bill of exceptions, exhibiting any thing brought into the record for the first time on that motion, and, as he had no right to have such a bill of exceptions, it constitutes no part of the record, and can not be considered by this court; and consequently we can not know that any such error as that complained of was committed.
We have no power to look into a bill of exceptions which the legislature has declared should not be allowed, or into a general bill for matters not the subjects of exception, and then to reverse for an alleged error thus improperly appearing in the transcript.
We must reverse for any error of law appearing in the record to the prejudice of the appellant, but this only applies to such errors as the party had a right to manifest by bill of exceptions ; and as a bill of exceptions, not only not authorized, but expressly prohibited by law, is no part of the record, an error , in respect to any of the matters which, under section 281, can not be excepted to, is not an error appearing “in the record” within the meaning of section 340.
And, for the same reason, we can not consider the alleged errors in not keeping the jury together, and permitting the attorney for the Commonwealth to go out of the record to make statements concerning the character of the appellant. Had the court been appealed to to stop that course of argument, and refused to interfere, the question might have been *345 different. No such appeal was made, and consequently the court made no decision on the subject until it came to rule on the motion for a new trial, and for error in that we have already seen we have no power to reverse.
3. The Commonwealth introduced evidence to prove that the appellant, while being conducted to jail under an order of the county judge committing him to answer the charge in this case, escaped from the officer and guard and fled, and remained at large until again arrested. The defense offered in rebuttal to prove that the jail to which he was being conducted was in a filthy condition; but upon objection being made by the Commonwealth, the evidence was rejected. “ At this juncture,” as the bill of exceptions recites, “the court remarked, in the presence and within the hearing of the jury, that the Commonwealth always had a right to show that a man runs because he is afraid of a trial, and the law always held that flight could be used as presumptive evidence of guilt, and the defendant could show that he fled on account of apprehended violence or danger to life.”
“ To this counsel responded that, if such was the presumption, defendant ought to be permitted to rebut it; and the court responded in the presence and within the hearing of the jury that counsel could put Peacock’s testimony in the bill of exceptions.” Peacock was the witness by whom it was proposed to prove the condition of the jail.
No exception was taken at the time to the remarks of the court, and if there had been we are not of the opinion that they would furnish ground sufficient to warrant a reversal. Yet, we regard it the safer course for the judge to refrain from giving reasons, in the presence of the jury, for decisions upon questions which may by any possibility prejudice, the rights of either party. This is unlike the case of Coppage v. Commonwealth, 3 Bush, 533. .What the court said in this case was no more than it had in effect said when evidence of *346 the appellant’s escape and flight was allowed to be given to the jury, while the remark made by the judge in Coppage’s case “ erroneously implied not only that the written statement was evidence of all the facts contained in it, but also that it was the more impressive as proof offered by the accused himself,” whereas, in offering the written statement, the accused announced that it was for the sole purpose of contradicting the witness. In that case there was an erroneous and misleading interpretation and application of the evidence, while in this case what the court said in regard to evidence of escape and flight was no more than the jury must already have understood from the action of the court in admitting the evidence. The reference by the court to a bill of exceptions was not calculated to mislead or to impress the jury to the appellant’s prejudice. They can not be presumed to have been so familiar with legal terms and the forms of legal proceedings as to have understood, from this casual allusion to a bill of exceptions, that the court expected them to convict the appellant.
Was the rejected testimony of Peacock competent ? When flight has been proved as furnishing evidence of guilt, it is competent for the accused to prove other causes which may have influenced him to fly, and leave the jury to decide whether his flight was caused by a consciousness of guilt and apprehension of conviction, or by such other causes as he may prove to have existed. But it would be clear that a mere aversion to lawful imprisonment could not be allowed to be gived in evidence for that purpose. One charged with a crime against society can not be allowed to offer his mere fastidiousness of taste to rebut legal evidence of guilt.
Counsel “stated that they could prove by witness that, before and at the time defendant made his escape from the guard, the jail in which he had been confined, and to which he was being taken by the guard, was in such a condition *347 that witness, as one of the guard, while sleeping above stairs immediately above the cell where defendant was confined, on account of the stench that came through the floor and ceiling, was compelled to find other quarters; that such stench and filth were calculated to destroy defendant’s health and endanger his life, and kill a hog; that on the first trial of this case the condition of said jail was such that the presiding judge in this case refused to send defendant to same, and had him guarded in the court house.”
The statute provides that the county court shall prescribe rules for the government and cleanliness of the jail, and the comfort of the prisoners, and may, by fine, enforce the rules and punish the jailer for disobedience thereto, or for neglect of his official duties; and it also provides that the county judge shall inspect the jail at least once a month. (Secs. 10 and 12, art. 1, chap. 61, Gen. Stat.)
The appellant had just been ordered to jail by the county judge, whose duty it was, and who had ample power to require the jail to be made clean and comfortable; and we must presume that, had his attention been called to the condition of the jail, if in fact it was in the condition appellant offered to prove, he would at once have required it to be cleaned, and freed from the offensive odors said to have existed in it. The appellant thus had in his power the means of relieving himself from the danger which he claims to have apprehended from the condition of the jail; and if it be said that the county judge might have refused to do his duty, it is sufficient answer to say that it was appellant’s duty to put him to the test before resorting to an illegal escape; and that, as he had means at his, command which would most probably have relieved him of the apprehended danger, and which he could try without peril, he ought not, without showing some effort to use the lawful means at hand, to have been allowed to prove that his escape was prompted by apprehensions of danger to *348 his health from the odors of the jail, rather than from a consciousness of guilt. Evidence of apprehended danger, in order to be admissible to rebut the inference of guilt which may be drawn from an escape and flight, should show such danger as could not have been readily, efficiently, and with entire safety provided against by the accused, either by his own act, or through the instrumentality of the officers of the law.
4. We come next to the consideration of the rulings of the court in instructing and in refusing to instruct the jury.
In instruction A the court instructed the jury in the law-of murder. To that instruction no objection has been suggested, and none is perceived.
In instructions B and C the court attempted to define the words “malice” and “aforethought,” which were used in the preceding instruction. To this counsel object, mainly, as we understand them, on the ground that the words are defined separately.
Counsel say: “ Now, it must be observed that the two instructions in reference to malice and aforethought are completely segregated, and by reason thereof calculated to mislead the minds of the jury in reference to the condition upon which they may find a-verdict of murder. In other words, the jury, in considering these two separate and disconnected instructions, would reach the conclusion that if the killing was done with malice alone, and without predetermination, the offense would be murder; or, if it was done with predetermination and without malice, it would be murder.”
This court is unable to see the force of the argument. The jury were told in instruction A that if the appellant “ willfully and with malice aforethought,” and not in his necessary self-defense, killed the deceased, he was guilty of murder. The jury were required to find that the killing was done with malice and aforethought. The two things are entirely distinct. Malice is one thing and aforethought is another, but *349 both are necessary to constitute murder, and the jury had been so told, and there is nothing in either of the instructions under consideration to indicate that the court meant that either might be dispensed with, or that could have been so understood by men of ordinary intelligence.
In instruction F the jury were told that if they believed from the evidence that the defendant, at the time he hilled E. D. Kennedy, believed, and had reasonable grounds to believe, that he was then in danger of losing his life, or of suffering great bodily harm at the hands of E. D. Kennedy, then the law permitted him to use such means as were necessary to protect himself from the impending danger, even to the taking of said Kennedy’s life.
No objection is taken to the instruction on account of the words placed in italics, in which the court assumed as a fact that the prisoner killed the deceased.
Instructions asked by the appellant’s counsel used similar language which, as well as the evidence and whole conduct of the trial, shows that the killing was not controverted.
But counsel object to the use of the word “then” placed in capitals. “By the use of this adverb,” counsel say, “the appellant’s right to thwart the apprehended danger is limited in a manner hitherto unrecognized by the courts of the country. In other words, the danger to the appellant should not only have been existing, immediate, and impending, but he had the right to view it only from the standpoint of things occurring at the moment. The law has been held otherwise in Philips v. Commonwealth, 2 Duv. 328; Young v. Same, 6 Bush, 312 and Bohannon v. Same, 8 Bush, 486.”
There may be language in the first of these cases which admits of the construction placed upon them all by counsel, but that part of the opinion was declared in Bohannon’s case not to be authority.
The principle announced in Young’s case is, that one who *350 has been assaulted and put in danger of losing his life, if he have reasonable ground to apprehend that his adversary, who has withdrawn from the combat, will return presently and renew the assault, may pursue until he may reasonably believe he is secure from danger, and if in doing so he slays his antagonist, it will be excusable self-defense.
In that case the deceased had assailed the prisoner at the latter’s house, and shot at him twice, after which he withdrew, the prisoner pursuing him for some distance. After having gone out of sight, and after the pursuit had ceased, the deceased returned to where the prisoner was, and renewed the attack, pistol in hand, and then again retreated, and the prisoner shot and killed him; but whether he was then retreating or was advancing on the prisoner, the third time, there was a conflict in the evidence. >
It was in view of these facts that this court said if Young had sufficient ground to apprehend, and did apprehend, that the deceased would take his life, or that he was in continual danger of losing his life, or suffering great bodily harm at his hands, “ and that if he returned to his house the attack would be renewed upon him, he might pursue his enemy until he might reasonably believe he was secure from danger,” and if, in doing so, he killed his adversary, he was excusable on the ground of self-defense.
There may be isolated portions of that opinion which give color to the idea that if the prisoner reasonably apprehended future danger he might lawfully kill his adversary, although he had no reasonable grounds to believe that he was then in danger; but when the whole opinion is considered together, it does not do more than announce the -doctrine in East, as quoted in Bohannon’s case.
So, too, there may be sentences in Bohannon’s case which, considered by themselves, and out of connection with the context, convey the same impression; but when the whole opinion *351 is considered together, in the light of the facts recited in it, it does not support the views of counsel.
In that case, after quoting East, and stating what was understood to be the doctrine stated by him, the court said:
“ However this may be, the threats of even a desperate and lawless man do not, and ought not, to authorize the person threatened to take his life; nor does any demonstration of hostility, short of a manifest attempt to commit a felony, justify a measure so extreme. But when one’s life has been repeatedly threatened by such an enemy, when an actual attempt has been made to assassinate him, and when, after all this, members of his family have been informed by his assailant that he is to be killed on sight, we hold that he may lawfully arm himself to resist the threatened attack. He may leave his home for the transaction of legitimate business, or for any lawful or px’oper purpose; and if on such an occasion he casually meets his enemy, having reason to believe him to be ai’med, and ready to execute his murderous intention, and he does believe, and from the threats, the previous assault, the character of the man, and the circumstances attending the meeting, he has the right to believe, that the presence of his adversary puts his life in imminent peril, and that he can secure his personal safety in no other way than to kill him, he is not obliged to wait until he is actually assailed.”
A careful analysis of this language will show that the court meant to distinguish between a case in which the slayer has been both threatened and assaulted with a deadly weapon on an occasion prior to the killing, and one in which he has been merely threatened without being assaulted. In the latter case the language is that “ the threats of even a desperate and lawless man do not, and ought not, to authorize the person threatened to take his life; nor does any demonstration of hostility, short of a manifest attempt to commit a felony, justify a measure so extreme” But when such an enemy has not: only threatened' *352 the slayer, but has attempted to assassinate him, then he may arm himself to resist the attack, and may go abroad as business or pleasure may require; and if he casually meets his enemy, and has reason to believe that he is armed and ready to execute his murderous intentions, and does so believe, and from the threats, the previous assault, the character of the man, and the circumstances attending the meeting, “ he has the right to believe that the presence of his adversary puts his life in imminent peril, and that he can secure his safety in no other way than by killing him, he is not obliged to wait until he is actually assailed.”
But while these two classes of cases are distinguished in the opinion, there is nothing in what is said of either class which conveys the idea that the killing will be excused unless the danger exists, or on reasonable ground is believed to exist, at the moment of striking the fatal blow.
The circumstances may be such that a reasonable apprehension of immediately losing one’s life, or sustaining great bodily harm, may exist without a hostile demonstration, and Bohannon’s case decides that when such apprehension does exist, the person thus in peril, or upon reasonable grounds believing himself to be in peril, need not wait until he is actually assailed.
But that case does not decide that, although a person so threatened and previously assaulted may not upon reasonable grounds apprehend that he is then in danger, he may nevertheless kill his adversary because he may have reasonable ground to believe that he will, at some future time, be in such danger.
Threats, menaces, assaults, lying in wait, carrying arms, the character of the deceased for violence or lawlessness, the circumstances of the meeting, and any other fact tending to show that the slayer was in peril at the time of the homicide, or that he had reasonable grounds upon which to believe he was *353 in such peril, may all be given in evidence for the purpose of showing that there were grounds to believe he was then in danger; but if, notwithstanding all these things, he had no reasonable ground for believing he was then in danger, they will not excuse him on the ground of self-defense, although they may have justified him in believing he would be in such danger at some future time. ,
This is in consonance with the philosophy of the law of self-defense, which is based on necessity, real or apparent. When there is no necessity, .or apparent necessity, to slay an adversary to save one’s life or person from great harm, there can not, in the nature of things, be a right to kill in self-defense.
It is next objected that the court erred in refusing to give an instruction asked by appellant’s counsel, in effect that if, at the time he killed the deceased, he believed, and had reasonable ground to believe, he was in imminent danger of losing his life, or of suffering great bodily harm at the hands of the deceased, they must acquit him, even though in point of fact he was in no danger. Such is unquestionably the law as established by numerous decisions of this court; but we are of the opinion that this principle was clearly stated in the instructions given by the court. The jury were told that if the appellant believed, and had reasonable ground to believe, he was then (i. e. at the time of th,e killing) in danger of losing his life at the hands of the deceased, he should be acquitted. His right to acquittal was thus made to rest upon his belief, based on reasonable grounds, and not upon the actual existence of the facts which produced the belief. The words “ reasonable grounds to believe” can not have failed to convey to the minds of the jury the distinct idea that if there were such appearances of danger as to beget in the mind of the appellant a reasonable belief of actual danger, he was entitled to an acquittal, and this necessarily includes the idea *354 that he was entitled to an acquittal, whether the appearances of danger were real or not. Moreover, such an instruction might, under the peculiar facts of this case, have misled the jury by making the impression on them that the plea of self-defense could be sustained without the existence at the time of the homicide of an apparent present necessity to strike for his own protection. (Dupree v. the State, 33 Ala. 380.)
The appellant introduced J. T. Higgins, who testified, in chief, as follows:
“I live in Lancaster; the defendant and I married sisters; my wife is a niece of deceased; in February, 1877, I was engaged in keeping a saloon and livery-stable connected with the Huffman Hotel; on the Friday before [the] killing I met the deceased at the mouth of the alley which leads back from Stanford Street to my livery-stable; the alley runs along the north side of the hotel building; deceased asked me where Grove (the defendant) was; he was considerably drinking; I said, ‘What do you want? he said, ‘I want to see him — I want to settle that case; we can settle it out of court;’ the deceased had at the time a square-barreled navy-pistol protruding from his pocket; he insisted on going in the house, where I thought defendant was at the time, and where I knew he was a short time before; I struggled with deceased, and got him down the alley a piece, when he said, ‘ Now, John Higgins, I know what you want; you want to get me off home, and I am not going; ’ he then turned, and came back toward the hotel; he still insisted on going in the house, but was finally induced sto go up the street.”
This is the whole of the testimony of the witness on his examination in chief. He was then cross-examined, as follows :
“ I think the deceased said something about Grove bulldozing.” The prosecution here asked if witness did not, *355 on the evening of the killing, in the town of Lancaster, say to H. G. Wilds that it was “ a God damned murder, and that he ought to be prosecuted to the full extent of the law.” To which question the defendant at the time objected, and his objections were overruled, to which ruling defendant at the time excepted. Witness then answered, “ I do not recollect.”
“The prosecution then asked witness if he did not, on the night of the killing, in the presence of William Beazley. Robert Conn, and Dr. Huffman, say that Grove was in a bad fix, and he (witness) would not be in his (Grove’s) place for Europe, Asia, and Africa.
“To which question the defendant at the time objected, and his objection being overruled, at the time excepted to such ruling. Witness then responded that if he had such conversation he had no memory of it. He further testified: “ I know I said it was a most unfortunate killing. I did not see it, and was considerably excited when I heard of the occurrence. I am naturally a nervous man.”
Upon redirect examination the witness said, “The deceased had his hand on his pistol at the time he wanted to see the defendant.”
And on recross-examination the prosecution asked witness if he did not, the night of the killing, say to Bob Conn, at deceased’s house, that it was one of the most unprovoked murders he ever heard of — that Grove Kennedy had no ground for killing Eb. Kennedy. To which question the defendant at the time objected, and his objections being overruled, he excepted at the time, and yet excepts. Witness then answered that he made no such- statement.
“ Plaintiff here asked the witness if he did not, the morning after the killing, or the succeeding morning, say to B. F. Slavin that it was an awful murder — the worst in the county; that there was no cause for it.”
*356 The appellant again objected, but his objection was overruled, and he excepted. ■
The witness then answered: “ I came down in town with , Ben. Slavin next morning, but it is not my recollection that I told him Grove had no excuse for doing what he did. I remember that we talked generally about the killing, and that I expressed the opinion that it was a very unfortunate affair.”
The Commonwealth was then permitted to prove by Conn and Slavin that the witness Higgins had made to them, respectively, substantially the statements inquired about as having been made at the residence of the deceased and on the way to town. To the admission of this evidence proper exceptions were reserved.
Higgins was appellant’s witness, and had testified to facts deemed important to the defense, and whatever was clearly calculated to weaken his credibility with the jury was to appellant’s prejudice. The court told the jury that if they believed any witness had knowingly sworn falsely to any material fact, they might disregard the entire testimony of such witness. Higgins had sworn that he did not tell Conn or Slavin that it was an unprovoked, an awful murder, and the court, notwithstanding the objections of appellant’s counsel, permitted the Commonwealth to prove that he had made these statements.
What more natural than that the jury would regard Higgins’s denial that he had made these statements as material? And two witnesses having sworn that he did make them, who can say that the jury did not discard and discredit the whole of his testimony on account of the contradicting statements of Conn and Slavin?
These reasons satisfy us that the cross-examination of Higgins as to alleged declarations by him, and the testimony of Conn and Slavin that he made these declarations, may have *357 had an important bearing against the appellant, and it follows that, if this evidence was illegal, the judgment must be reversed.
Whether Higgins had said the killing of the deceased was an unprovoked murder, or an awful murder, did not serve to explain, modify, or contradict any thing he had testified to on his direct examination, nor did it serve to show bias or prejudice in his mind in favor of the appellant or the prosecution; but, on the contrary, if he made those statements, it rather tended to prove prejudice and bias against the appellant.
His alleged statements were therefore not admissible, either to contradict or explain his testimony in chief, or to show his animus, thereby laying a foundation for inferring that he was so prejudiced in favor of the appellant that the truth of his statements might be suspected on that ground. These statements to Conn and Slavin were therefore wholly immaterial and irrelevant to the issue being tried, and the only other ground upon which they can by any possibility be claimed to be admissible is, that they furnish grounds for contradicting the witness, and this we understand to be the view with which the evidence was offered.
“A witness is not to be cross-examined as to any distinct collateral fact for the purpose of afterward'impeaching his testimony by contradicting him.” (Starkie on Ev. 200.)
In Nation v. People, 6 Parker’s Crim. Reps., Nation was tried for larceny; Graham was a witness for the prosecution, and was asked by the prisoner’s counsel, on cross-examination, if he had not said to one Davis that if the prisoner would refund to him a part of the money he had lost, he would not swear against him. Graham answered that he had made no such statement. The prisoner then offered to prove by Davis that Graham had made the statement inquired about, but the court rejected the evidence.
*358 On appeal the Supreme Court of New York held the ruling correct, on the ground that the fact, as to which it was sought to contradict the witness, was,collateral and immaterial.
In Hildeburn v. Curran, 65 Pa. St. 59, the Supreme Court of Pennsylvania, per Sharswood, J., said, “ The rule is well settled that if a witness is cross-examined to a fact purely collateral and irrelevant to the issue, and answers it without objection, he can not be contradicted.”
The same principle has been repeatedly recognized by the Supreme Court of New Hampshire. (Combs v. Winchester, 39 N. H. 33; Seavy v. Dearborn, 19 ib. 355.)
In the latter case it was said “ that a question, not otherwise material or proper, does not become so by force of any purpose of the examining party to make use of it to discredit the witness by contradicting his answer to it.....
“A witness therefore shall not be interrogated on a subject not relevant to the issue for the mere purpose of contradicting him.”
Harper v. R. R. Co., 47 Missouri, 567, was an action by a child to recover damages for an injury inflicted by the defendant. The father of the child testified on the trial as a witness for the plaintiff. He testified that he had not said that no one was to' blame for the accident that happened to his son.
Evidence was offered to contradict him on this point. The court, per Wagner, J., said: “The father was not present at the time of the injury, and consequently what he said in this regard was irrelevant and immaterial, being mere hearsay, and totally inadmissible. A witness is not to be interrogated on a subject not pertinent to the issue for the mere purpose of discrediting him. It was Avholly immaterial Avhat the father stated in reference to the accident, or hoAV it happened.”
In Commonwealth v. Mooney, 110 Mass. 99, Allen, a wit *359 ness for the Commonwealth, having testified to .certain facts tending to prove the guilt of the defendant, it was held not competent for the defendant to show -that Allen had expressed the opinion that Mooney was not guilty. “ The fact,” said the court, “ that he had an opinion that the defendant was innocent would not tend to contradict or impeach him.
“ At most, it only shows the weight he gave to the facts testified to by him as tending to prove the defendant’s guilt, which is for the jury exclusively, and upon which the opinion of witnesses is not competent.”
This doctrine was approved by this court in Cornelius v. Commonwealth, 15 B. Mon.'539, where that accurate, learned, and pains-taking jurist, Judge Simpson, speaking for the court, said, “As a general rule, a witness can not be cross-examined as to any fact, which is collateral and irrelevant, merely for the purpose of contradicting him by other evidence, if he should deny it, thereby to discredit his testimony.”
But the questions asked Higgins were clearly illegal upon another ground. They tended to elicit illegal and injurious evidence against the appellant. No one would pretend to claim that the Commonwealth might legally prove as a substantive fact, in support of its case, that Higgins had said the killing of the deceased was an unprovoked or an awful murder, and that the appellant should be prosecuted for it to the extent of the law. No lawyer would think of offering such evidence in chief. Upon what principle, then, could the fact be inquired of on cross-examination ?
Considerable latitude may well be allowed in the cross-examination of a witness with a view to test his memory, his capacity, and his veracity; “ but this license,” said the Supreme Court of New Hampshire, in Seavy v. Dearborn, supra, “has various restrictions. In the first place, it does not extend *360 so far as to authorize a party to prove by a witness, on cross-examination, things positively improper to be proved at all; and, secondly, he can not, for the purpose of discrediting a witness, contradict, by other evidence, his statements that are improper and immaterial. In other words he may, for the purposes before indicated (i. e. to test the witness’s memory, capacity, and veracity), ask questions not strictly relevant to the issue, provided they do not tend to elicit testimony that is injurious and improper.”
As the questions addressed to Higgins tended directly to elicit illegal and injurious evidence against the appellant, the court erred in permitting the witness to answer.
But if it were conceded (which we do not mean to do) that the questions propounded to Higgins were competent for the purpose of testing his memory, his capacity, or his honesty, it would by no means follow that his answers might be contradicted by the testimony of other witnesses.
“If a question as to a collateral fact be put to a witness for the purpose of discrediting his testimony, his answer must be taken as conclusive, and no evidence can be afterward admitted to contradict it.” (Starkie on Evidence, 201, 10th ed.; Wharton on Evidence, sec. 551; Seavy v. Dearborn, 19 N. H. 355; Combs v. Winchester, 39 ib. 17, 18; Nation v. The People, 6 Park. 261.)
Many other authorities in support of these several propositions might be adduced, but as no case or author maintaining a contrary doctrine has been referred to by the attorney-general or his' associate counsel, or found in our own somewhat extended research, further reference to authority is deemed unnecessary.
The issue being tried was, whether the appellant was guilty of the crime charged against him, and was to be resolved by the jury upon their own opinions formed from facts and circumstances in evidence before them, and not from the *361 opinions of witnesses expressed from the witness-box, or declared out of court.
That the Commonwealth could not legally introduce the opinion of any witness as to the guilt of the accused is too clear for argument, and that it could not legally interrogate the appellant’s witness as to whether he had expressed the opinion that he was guilty, for the mere purpose of contradicting him, has been shown by abundant authority; yet, by the indirect method pursued, both these illegal results have been reached, and this mass of illegal evidence permitted to go to the jury without restriction, qualification, or explanation of the object for which it was allowed.
What effect it had on the minds of the jury no one can know; but, as said in Coppage v. Commonwealth, 3 Bush, 532, we can not speculate on its effect. “ It is enough for this court to know that it was wrong, and may have operated to the prejudice of the appellant.”
For the errors indicated the judgment is reversed, and the cause is remanded for a new trial upon principles not inconsistent with this opinion.