Case 28—INDICTMENT—June 14, 1884.

# Crittenden v. The Commonwealth.

APPEAL FROM JEFFERSON CIRCUIT COURT.

1. It is not competent to cross-examine a witness as to any distinct col--
   lateral fact not brought out in the examination-in-chief, with the·
   view of impeaching his testimony by introducing other witnesses to
   contradict him.

2. If a question as to such collateral fact be put to a witness with the·
   intent to discredit his evidence, his answer must be taken as conclu-
   sive. No evidence can be adduced afterwards to contradict it.

ISAAC CALDWELL, M. MUNDAY, KINNEY, and MUIR & HAYMAN for appellant.

1. The court erroneously allowed appellee to cross-examine Susan John-
   son as to matters not even referred to in her examination-in-chief, and·

Crittenden v. The Commonwealth.

which would, under any circumstances, be incompetent, and then erred in allowing appellee to contradict her answers by Nichols and Barnett.

2. This contradiction had the double tendency to destroy the credit of the witness and to prove as substantive facts what she said to them, when no such facts were proved. Starkie Ev., 200; 14 Bush, 357.

P. W. HARDIN, ATTORNEY GENERAL, AND A. G. CARUTH, COMMONWEALTH'S ATTORNEY, FOR APPELLEE.

1. There was no error in allowing appellee to prove the statements of Susan Johnson inconsistent with her answers upon cross-examination.

2. The whole tenor of witness's testimony was to establish want of malice. Appellee's effort to attack her was unsuccessful as the verdict showed, and, therefore, if it was error, it was not to appellant's prejudice. Whart. Crim. Ev., section 481; Commonwealth v. Goersen Crim. Law Mag., March, 1884, page 258; Bishop's Crim. Law, section 999; Champ v. Commonwealth, 2 Met., 17; 3 Bush, 532; section 840, Criminal Code as amended by act of March 4, 1880.

CHIEF JUSTICE HARGIS DELIVERED THE OPINION OF THE COURT.

On the 13th of December, 1882, the appellant, Thos. Crittenden, was arrested and tried for a breach of the peace, the deceased, Rose Mosby, a colored boy about nineteen years old, then employed as dining-room servant by appellant's father, being a witness against him. At the trial Mosby testified that Young, with whom appellant had the altercation, did not call the latter a white son of a b—h. Crittenden thereupon said: "I will see you later," or "I will see you this evening."

After the trial was over the parties separated and returned to their respective places near Anchorage depot, Mosby stopping at the house of Ellen Barnett, a colored woman. Crittenden went to the depot and there received an express package for his father and carried it to his house where Harry and Burnley, his brothers, were awaiting dinner. The dining-room was upstairs and the kitchen below.

Susan Johnson, who was introduced as a witness by
the appellant, testified on direct examination, that
when he came back from Middletown (where the trial
had taken place) he came into the kitchen "and asked
for Rose; if he had come. I said no, and he asked me
how long it would be before dinner, and I said as soon
as Rose come. He went upstairs and came down, and
asked if Rose had come. Then he came back again
and asked me if Rose had come. And then he said to
have the dinner, that Harry would set the table." She
said nothing about Crittenden being in a good humor
or making any threats. On cross-examination she said:
"When I was carrying the soup up I had on Rose's
apron. I said Mr. Thomas came out of the room when
I came up the steps. I did not know whether he was
going to the dining-room or going out. He ran against
me, and he said: "Is that you, Rose;" and I said,
"*yes.*" He said, "excuse me." She was then asked
if, while the Crittendens were awaiting dinner, she did
not go over "to Ellen Barnett's and take Rose Mosby
out and tell him not to come back to Crittendens'; that
he would be killed."

She answered: "No, sir; I did not think he would
be killed. I did not know."

She was then asked: "Were you not, when you
went there, in an alarmed and disturbed condition, and
did not you go there to warn him not to come there?"
Her answer was: "I don't know whether I was dis-
turbed or not. After he said he was not coming, I just
told him not to come."

She was asked substantially the same questions as to
an alleged conversation with Nichols, in which she was

supposed to have related what passed between her and
Rose Mosby at Ellen Barnett's. Her answer was: "I
don't know whether I told Henry (Nichols) that or
not."

The Commonwealth, against appellant's objections,
was then allowed to prove by Henry Nichols, "that
she said she told Rose not to come there; that Mr.
Tommy was looking for him and looked mad, and she
thought he would be hurt." "That Mr. Crittenden
had come down twice to look for him. He came into
the room where she was looking for Rose, and he
looked mad, and she got excited and ran up to Mrs.
Barnett's to tell him not to come there." And also by
Ellen Barnett, that "she said she had told Rose not to
come down there; that Mr. Tommy would shoot him."

This testimony was illegal, because it was an effort
substantially, and in effect, as said by this court in
Champ's case, 2 Met., 24, to show that the witness had
stated, out of court, facts which she failed to prove in
court, and thus to transform the hearsay testimony of
Nichols and Barnett into substantive evidence which
did not have the oath of Susan Johnson to support it,
for she denied the occurrences as shaped by the ques-
tions put to her, and also swore that she had not had
the alleged conversations with Nichols and Barnett,
who knew nothing personally of the existence of the
supposed facts.

Section 597, Civil Code, provides, that "a witness
may be impeached by the party against whom he is
produced    *    .*    *    by showing that he has made
statements different from his present testimony." But
the question here, on this point, is whether the alleged

·statements of Susan. Johnson are different from her ;testimony. There is no necessary. conflict between any-·thing she said on the examination-in-chief and the statements attributed to her by Nichols and Barnett. If there be any conflict or difference, it was drawn out ·by the cross-examination, and this should never be ·allowed for the sole purpose of contradicting the wit-·ness by statements made elsewhere. "A witness is not to be cross-examined as to any distinct collateral fact ·for the purpose of afterward impeaching his testimony by contradicting him." Starkie on Ev., 200 ; Kennedy v. Commonwealth, 357, 14 Bush.

Instead of differing from the tendency of her evi-·dence they rather accorded with it, and what she did was simply not to testify to substantive facts which she was supposed to know. She failed to state in court facts which, it is said, she admitted out of court, and it was illegal to supply the omission by hearsay testi-mony. This view is clearly sustained by the authority ·cited.

There is another phase of this alleged contradictory evidence. which renders it objectionable. It is this : Nichols was permitted to testify that she told him that she had told Mosby, "she *thought* he would be hurt; that Mr. Crittenden had come down twice to look for him." Her inference from the facts, as she stated them, does not necessarily follow, because Mosby was the dining-room boy, and by her testimony she shows that she was delaying dinner for Mosby to come and set the table, and that Crittenden finally said "to have the dinner, that Harry would *set the table.*" It was for the jury to determine from the facts she detailed,

and not from what she thought, whether Crittenden intended to kill Mosby, or was impatient for his dinner, and certainly the appellant's acts and words, and not her thoughts furnished the medium for ascertaining his motives and purposes. Commonwealth v. Mooney, 110 Mass., 99 ; Kennedy's case, 14 Bush, 358 ; 15 B. Mon., 539.

In the case of Loving v. Commonwealth, 80 Kentucky, 507, the doctrine of the cases of Kennedy and Champ is recognized and applied.

It is claimed by counsel for the Commonwealth that the evidence of Nichols and Ellen Barnett did not prejudice the substantial rights of appellant; first, because the appellant is clearly guilty, and second, he was only convicted of manslaughter. As to the first reason, it may be said that the court does not try the fact of the guilt or innocence of the prisoner; that is for the jury and the jury alone. And all men are entitled to a fair and legal trial, and we know of no exception to this rule. It is true that the verdict of the jury finding the appellant guilty of manslaughter excludes the idea that they believed he did the killing maliciously, but it does not follow for that reason that the appellant's substantial rights were not prejudiced by this evidence, for the question whether the killing was malicious was not the only issue in the case. The appellant's plea of not guilty controverted the malice necessary to constitute murder, and presented the claim of self-defense, which, if true, entitled him to an acquittal of the homicide in any degree. It will not do, therefore, to say this evidence was not prejudicial, for that would be to assume that it had no bearing

upon the plea of self-defense, which we can not concede. About the time Crittenden left the house after he ate his dinner, Mosby came into the kitchen and began eating, and when asked, by Susan Johnson, why he did not set down and eat his dinner as he ought to, "he said that he had not time; that Mr. Thomas wanted to see him and he wanted to see Mr. Thomas," and then went out. Shortly afterwards, at the depot, Crittenden met him and said: "Are you going over to the house and wash the dishes?" Mosby replied: "No; I don't think I will go there any more;" and Crittenden said, "very well," or "you won't?" "very well," and went back to the house. Just after he left Mosby picked up a rock and put it in his pocket. Crittenden was at the house some minutes, got his gun, loaded it with *bird shot*, saying he was going hunting, there having been some blackbirds seen in the neighborhood shortly before that time. He passed out of the back way, and as he went towards the stable, his brother says he told him to pay the expressage which Crittenden said he had forgot but would do so, and went on to the stable where he staid some five minutes, then he went to the west end of the depot, the route he took being much further than the usual way, got on to the platform which led to the express office, and according to the Commonwealth's witnesses who were friendly to Mosby, walked down it until near to Mosby, presented his gun, said, "you son of a bitch, you swore a damn lie against me in court," and shot him in the left breast. Mosby turned and Crittenden shot him under and between the right shoulder and spinal column. Mosby staggered twenty or

thirty feet and fell dead, or died soon after his fall. Burnley Crittenden testified that he came in a few moments, took the gun from appellant and unloaded it. He said when he got there there was a large rock in Mosby's hand. The Commonwealth claimed that Mosby had only one rock, and it was in his pocket, introducing several witnesses, who testified that they saw no rock in or near Mosby's hand after he fell, and that none was on the platform. Whether Burnley Crittenden was to be believed was for the jury to decide. The theory of the defense is, that Butler Nichols and Heath were members of a secret order to which Mosby belonged, and they were at or near the depot to sustain the latter in a contemplated assault on Crittenden; that they were consequently hostile witnesses; that Mosby had armed himself with rocks, and when Crittenden came up he drew the larger rock to throw at the latter, and was shot in the act; that Mosby went to the house, after he had been at Barnett's, showing no fear of Crittenden, but hurrying through eating so he could find him as he said he wished to see him; and that this evidence showed that the alleged statements of Susan Johnson, if made to him, had no influence on him, and could not have been as alarming as Nichols and Barnett would prove them to be by her conversations.

It is plain, therefore, that there was evidence, if true, tending to establish self-defense, whose force we refrain from discussing, for its weight and credibility belong to the triers of the fact; and the conversations with Susan Johnson testified to by Nichols and Barnett tended strongly to show that the alleged self-defense was a pretense, and the circumstances of loading the

:gun with bird shot, going the farthest way to the depot, and as if on a hunt, stopping by to pay expressage, and the presence of the larger rock in Mosby's hand after he fell were false appearances in part and perjury as to the rest, to excuse an otherwise willful murder. The alleged conversations of Susan Johnson, if believed, would naturally have impressed the jury that Crittenden was searching for Mosby in the kitchen every few minutes before dinner to kill him, and that his trips to the depot were for the same purpose, and tended to convince them that his plea of self defense was a sham.

It is not the duty of this court to speculate on the force of such important evidence and its weight with the jury, for it must have been prejudical to his substantial rights. To do so would be to hazard a conflict of opinion between court and jury on the weight of illegal evidence which, being sanctified by the court's admission as proof, may have had an important influence with the jury. 3 Bush, 352.

The discussion of the facts has been indulged solely to show the importance of the error in admitting the evidence of Nichols and Ellen Barnett as to conversations with Susan Johnson, and not to indicate our belief as to the truth or falsehood of any of the evidence or theories on either side.

Wherefore the judgment is reversed, and cause remanded with directions to grant appellant a new trial.