CASE 45—PROSECUTION OF JAMES B. HOWARD CHARGED WITH THE MURDER OF WILLIAM GOEBEL.—DEC. 17.

## Howard v. Commonwealth.

APPEAL FROM FRANKLIN CIRCUIT COURT.

DEFENDANT CONVICTED AND APPEALS. REVERSED.

HOMICIDE— TRIAL— EVIDENCE — CONSPIRACY —INSTRUCTIONS — GOOD CHARACTER OF ACCUSED—RES JUDICATA AND STARE DECISIS.

Held: 1 .Where, in a prosecution for homicide, a conspiracy is not charged, but the Commonwealth is permitted to introduce evidence that a conspiracy existed, that the accused was a member of it, and that various persons who are claimed to be co-conspirators did acts and made declarations in furtherance thereof, the jury should be told how far and under what circumstances they could consider evidence of the acts and doings of the co-conspirators as evidence against the defendant on trial, and failure to give any instruction limiting the effect of the evidence of conspiracy is error.

2 The court is not required to instruct the jury that the law pre-
   sumes the accused to be of a good character, and that this pre-
   sumption continues throughout the case, though such instruc-
   tion may be correct as an abstract proposition.
3. The rule that the law as declared on the first appeal is the
   controlling principle in the case on the second appeal is recog-
   nized, but the principle is sharply limited to points necessary
   to a determination of the cause.    On questions incidental or
   not considered on the first appeal, the court is not conclusively
   bound on the second appeal.

GORDON & GORDON, J. A. SCOTT AND J. A. VIOLETT, FOR AP-
   PELLANT.

T C. CAMPBELL, R. B. FRANKLIN, B. G. WILLIAMS AND L.
   W. ARNETT, FOR THE COMMONWEALTH.

   (No briefs in the record.)

OPINION OF THE COURT BY JUDGE DURELLE—REVERSING.

   Appellant, James B. Howard, having been jointly indict-
ed with Henry Youtsey, Berry Howard, Harlan Whittaker,
and Richard Combs for the murder of William Goebel,
was, upon separate trial, found guilty.     Upon the former
appeal of this case, 110 Ky., 356, 22 R. 1854 (61 S. W., 756),
enough   was   written   in   the   opinion,   and   in   the
separate  concurring  opinions  of  Chief  Justice  Payn-
ter  and  Judges  Hobson  and  White,  to  give  a  gen-
eral  idea  of  the  circumstances  surrounding  the  mur-
der, as disclosed by the record, and to show the conten-
tions, on behalf of the Commonwealth and the accused.   Up-
on that trial the contention of the accused was that he had
not been in Frankfort for over a year, before the morn-
ing of the assassination, except when summoned as a wit-
ness in the federal court; that he wished to obtain a par-
don from Taylor, who had received a certificate of election
as governor, for a crime whereof he stood indicted in the
Clay circuit court; that he was notified by one of his friends
that the contest over the governorship between Taylor and
Goebel would soon be decided, and probably in favor of

Goebel, and therefore, if he desired to apply for a pardon to Taylor, he should do so before the judgment; that immediately thereafter he went to Frankfort for the purpose of making the application, and arrived there about one hour before the shooting. His effort, therefore, was to show that his visit to Frankfort was solely for the purpose of obtaining a pardon, and had nothing to do with the murder of Senator Goebel. The crime of which appellant was accused in Clay county was the murder of George Baker. It is perfectly evident, under the doctrine laid down in the case of Welsh v. Com. (110 Ky., 530) (23 R., 151) (60 S. W., 185, 948, 1118, 63 S. W., 984, 64 S. W., 262), that neither the fact that he was indicted for that crime in Clay county, nor the fact that he committed the crime, could have been shown against him in this case, either as a defendant or as a witness in his own behalf. Such facts could not be shown against him as a defendant, because irrelevant. They could not be shown against him to impeach him as a witness, because such a mode of impeachment is forbidden by the statute. On the former trial, as he had the right to do, he waived his right, and, upon direct examination, stated that he was indicted in Clay county for killing George Baker, and came to Frankfort on the 30th of January, 1900, to try to get a pardon. Upon cross-examination he was asked, and compelled to answer, against objection, whether Baker was not an old man, unarmed, with his hands up, begging Howard for God's sake to spare his life. There was other cross-examination, of like character, as to the shooting from a curtained window, of Tom Baker, in the presence of his wife and infant child, and as to whether Howard was guilty of that killing, and had been indicted therefor, which cross-examination was not objected to, but was referred to in the opinion for the guid-

ance of the circuit court upon the second trial.    That the cross-examination which was objected to was improper was conceded by all the court, six of the judges concurring in the opinion that it was seriously prejudicial; and the whole court concurred in the reversal of the case on account of the improper statements to the jury by one of the counsel for the Commonwealth.   The court's view of the law was thus stated in the concurring opinion of Judge Hobson, which must be regarded as the law of the case:    "Judge White and I concur in the opinion of the court in the reversal of the judgment in this case on the ground that the particulars of the shooting of Baker by appellant should not have been admitted in evidence, and that, as the record stands, the statement of the attorney for the State in his closing speech, set out in the opinion, was peculiarly prejudicial. Appellant can not be convicted in this case because he may have committed another crime of like character, and proof that he had done so, or even such an impression, might seriously prejudice him before the jury, who might consider that such proof showed he was the character of person who would commit such a deed as that charged herein." When put on trial for the second time, the accused had the same rights as he had upon his first trial.    He might waive them or not, at his election, for he had been granted a new trial.    He was not estopped by the course he pursued upon the first trial in objecting or failing to object to the admission of incompetent testimony, nor by his own statement of a fact which could not properly be proved against his objection.    Nevertheless, in the opening statement, counsel for the Commonwealth was permited to state to the jury, against objection, describing the situation upon the day of the murder:    "At that time W. S. Taylor had the pardoning power, and at that time James B. Howard,

the defendant in this case, was under indictment for the murder of George Baker." Counsel further was permitted to state, against objection, that: "He has stated in the presence of a jury, in this courtroom, that he came to get a pardon. Surely the gentleman won't object to that." That this was improper there can be no doubt, under the rulings of the former opinion, where the court said: ".

. . And it is a well-established rule that it is error sufficient to reverse a judgment for the court to suffer counsel, against the objection of the defendant, to state facts not in the evidence or pertinent to the issue, and the evidence of which would have been ruled out. 2 Enc. Pl. & Prac. p. 727; Kennedy v. Com., 77 Ky., 340; Howard v. Com., 110 Ky., 356; 22 R., 1854, 61 S. W., 756." Whether it was prejudicial must be determined from the subsequent proceedings in the case.

After Howard's direct examination, in which he detailed the circumstances of his trip, he was asked, on cross-examination, and compelled, against objection, to answer, the question "For what purpose were you going to Frankfort?" He replied: "I came here to get a pardon,—to try to get one. Q. To get a pardon from whom? A. From Governor Taylor. Q. For what?" To this question the court sustained an objection. He was compelled to state, against objection, what was contained in a letter read to him by Bev. White from the latter's brother, viz., that the latter thought Taylor would be ousted in a few days, and if Howard wanted to get a pardon he had better come on and see him before he was ousted, as well as some matters in regard to Mr. Parker assisting Howard in seeing a Laurel county jury about assisting him in obtaining a pardon. The witness Feeny, having on direct examination stated that he had known Howard for some three or four years, was compelled to answer that he first met him in the Rich-

mond jail.    The witness W. F. Phillips, a witness for the
accused, was asked on cross-examination if, a short time
before Senator Goebel was shot, Jim Howard, Bev. White,
and John G. White were not holding secret conferences and
caucuses there, and not inviting the witness to be present or
permitting him to hear,—so much so that it became un-
pleasant for him,—and for that reason he sold out his inter-
est and moved to Burning Springs, in that county, to which
he answered, "No."     He was then asked if, in a conver-
sation with W. D. Weaver, he had not asked Weaver if
he knew they were accusing Jim Howard of having killed
Mr. Goebel, and if Weaver did not say, "No; I didn't know
it, but I suspected it, because it was done on the same
plan that Tom Baker was killed at Manchester,"—and if
witness did not then state that he had been in business
with Bev. White, and Bev. White and Jim Howard and
others were constantly caucusing at the store, and holding
secret conferences to which he was not invited, conducting
themselves in such a manner that it became unpleasant
for him. and that he dissolved the partnership and moved
his stock of goods to Burning Springs.    The witness an-
swered that he did not remember it.    Afterwards the wit-
ness Weaver was permitted to answer, against objection,
that the conversation between Phillips and himself did oc-.
cur as indicated in the question; thus permitting Weaver,
when under oath, to detail to the jury a statement by
him when not under oath of his suspicion of the accused
in connection with another murder, and that the murder
of another Baker, committed under peculiarly revolting
circumstances, and in a manner similar to that in which
the murder of Goebel was committed.    This suspicion of
Weaver was clearly incompetent, and as clearly unneces-
sary to the contradiction of the statement of the witness

Phillips. Com. v. Hourigan, 89 Ky., 311 (11 R., 509), 12 S. W., 550; Crittenden v. Com., 82 Ky., 167 (6 R., 20). The procedure complained of here goes a step farther than what was condemned in the two cases cited. There the court condemned an effort to show that the witness who was being cross-examined had stated out of court facts which he failed to prove in court, and thus to transform such hearsay testimony into substantive evidence which did not have the oath of the witness to support it. Here it was not the hearsay statement of a cross examined witness which was transformed into substantive evidence against the defendant, but evidence of what a third party said to the witness. The leading counsel for the Commonwealth, in his address to the jury, referring to the testimony, given on compulsion, that Howard's visit to Frankfort was for the purpose of obtaining a pardon, was permitted to say, against objection: "Why did he leave his home? He tells us that he left for the purpose of getting a pardon, but he declines to tell us for what that pardon was to be. Let us try and reason for ourselves what it was, and I ask you to think what kind of a pardon did he need, that would take him from his home so suddenly? He didn't get the word until this afternoon of Saturday, the 27th, and yet we find him on his way on Sunday morning. What was it? They objected to James Howard telling it, and you are therefore left to guess for yourselves what it could have been. What is it that this man required such hot haste for him to leave and come by London and stop at Winchester, reaching Frankfort on the morning of the 30th? What kind of a crime? It would not be for carrying a pistol. It would not be for disorderly conduct. It would not be for stealing. I don't believe Jim Howard would steal. I give him credit for that. Then it was something, was it not, that

we are not permitted to know, and we are forced to guess?
Would you guess it was murder?    It must have been a
heinous murder that would require this man to leave his
home, surrounded by his friends, to come to Frankfort."
And again, after an impressive reference to the mountain
feuds, and to "waylayings and ambushings day after day,
and month after month, and year after year," counsel was
also permitted to say: "Goebel was killed as Tom Baker
was killed.    Clay county invented that method.    I am not
saying that Jim Howard did that, but Clay county did."
And again counsel exclaimed, alluding to the trial of Pow-
ers at Georgetown for the same offense: " 'Let them prove
it!  Let them prove it!' was the cry at Georgetown." It
is impossible, in reading this record, to escape the conclu-
sion that counsel determined to get around the former opin-
ion of this court, and, by indirection and innuendo, to get
before the jury exactly what this court had said should
not be directly proven, and that they succeeded in their
undertaking.    Having got before the jury a statement that
the defendant was indicted for the murder of George Baker;
that he was seeking a pardon for that offense; that he had
been in the Richmond jail; that he was seeking the assist-
ance of a Laurel county jury to obtain his pardon; that he
was under suspicion of the murder of Tom Baker, commit-
ted under circumstances similar to the murder of Goebel,
with which he is here charged,—these matters are argued to
the jury as if proven, and doubtless produced the same ef-
fect upon the minds of the jury.    And if "appellant can
not be convicted in this case because he might have commit-
ted another crime of like character," and if "proof that he
had done so, or even such an impression, might seriously
prejudice him before the jury," can we say it was not preju-
dicial to permit these statements to be made to the jury,

with all the color and fire of the practiced jury orator, doubly impressive because of the sanction of the respected circuit judge, and supported by the incompetent evidence and suggestions which had been adroitly injected into the record? We do not undertake to say that each and every one of these matters would, in and of itself alone, be sufficient to entitle appellant to a reversal; but taken together, in the manner in which they were presented to the jury, they were prejudicial in a high degree.

Certain objections to testimony are urged upon this appeal, which were argued, and must be presumed to have been considered, upon the former appeal; but there are some objections urged which should be considered:

The witness J. B. Matthews was asked if, at a speaking in Somerset before the election, in the fall of 1899, he said, in substance: "Goebel will never be governor. Some one will kill him first." While this might be permissible on cross-examination, it was clearly collateral. It occurred long before the date at which it is claimed any conspiracy was formed, and the Commonwealth should not have been permitted to prove by the witness Epperson that Matthews made the statement. Whether this was prejudicial, however, is doubful.

The witness Sanderlin, called for the Commonwealth, on his re-examination was permitted to state, against objection, that Robert Webb had a conference with Beverly White in the courtyard, after which Webb told the witness that White would give him $50 if he would leave. This would seem to be hearsay.

It is also objected that the Commonwealth was permitted to read the legislative journal, showing that in 1900 Republican members of the Legislature voted for the witness Stubblefield for doorkeeper; the evidence being introduced

for the purpose of sustaining Stubblefield's character, which had been attacked. This does not appear to be an authorized mode of establishing the fact sought to be established, but does not seem to be particularly material.

It is objected that Chadwell testified that, in the presence of himself and one Jones, accused said that Goebel "was shot a bad shot, or a deadener; that he saw them taking him off, and he thought he was shot a bad shot." After Howard denied having such a conversation, Jones was introduced in rebuttal, and, against objection, permitted to detail the same conversation. While this testimony of Jones was properly primary testimony, and should have been introduced in chief, some discretion is necessarily allowed the trial court as to such matters, and this hardly amounts to an abuse of such discretion.

There was testimony tending to show that the accused had been recognized running from the Executive building, and at the doorway, with a black, stubby mustache. For the defense, the accused and other witnesses testified that he had been smooth-shaven for a year or more before the killing. The Commonwealth was permitted, in rebuttal, to introduce testimony showing that some months before the murder the accused had possession of a false mustache. This seems to have been perfectly competent rebuttal testimony.

Upon the former appeal it was elaborately argued that, inasmuch as the indictment charged the murder to have been committed by the accused acting jointly with certain named co-defendants and others unknown to the grand jury, and contained no averment of a conspiracy, no testimony should have been permitted, the object of which was to show the existence of a conspiracy, and no testimony as to the acts or declarations of the supposed co-conspirators. It

was perhaps natural, when counsel relied with such confidence upon the absolute incompetency of the testimony objected to, that they should not have presented any instruction as to the effect of such testimony, if considered admissible; and upon the former appeal the question of how far, and under what circumstances, the acts and declarations of co-conspirators were admissible against the accused, was not presented in argument or considered by the court. Upon the second trial, however, an instruction was offered by the accused, and refused, that he could not be convicted upon evidence of what other persons did, but must be convicted, if at all, only upon proof of his own acts and conduct, which must be proved beyond a reasonable doubt; and it is argued here that if, as was the fact, a "great mass of testimony of acts and conversations of persons other than the accused is permitted to go to the jury, and be considered by them on the conspiracy theory, then the jury should have been instructed as to the purpose of such testimony, and how far and under what conditions it could be considered by them against the accused;" that, in the language used in Robertson, Ky. Cr. Law (section 109) : "If, after the acts and declarations are admitted in evidence, the testimony to establish the conspiracy is not conclusive, 'the question as to the existence of such conspiracy, at the time of the acts and declarations, should be submitted to the jury under appropriate instructions;' and the question of whether the parties actually did confederate in a common purpose, and whether the acts and declarations offered in evidence were actually done in furtherance of that design, is for the determination of the jury." Oldham v. Bentley, 6 B. Mon., 431, is cited in support of this proposition, where it was said: "It is objected that the court improperly refused to tell the jury that the admission of one of the de-

fendants in the absence of the other was not evidence against both.    But as there had been previous evidence conducing to prove a combination, the evidence objected to was properly left to the jury, with instruction that, unless they believed from other evidence that the defendants had combined for the purpose of effecting the purpose as alleged, this evidence should have no effect as proof, except against the defendant who made the admission."    See, also, Sodusky v. McGee, 7 J. J. Marsh., 266, and Goins v. State, 46 Ohio St., 457, 21 N. E. 476; the latter case being the only adjudged case in support of the admission of testimony as to the acts and declarations of co-conspirators upon the trial of an indictment where conspiracy is not charged, in which case there is a clear recognition of the principle contended for.

While the instruction which was in fact asked upon this subject was not framed in accordance with the rule in this State, the fact remains that an instruction was asked directly upon this subject, and the court should have given the whole law of the case.    And while upon the former appeal the question of an instruction upon this point was not presented or considered, and the only questions considered upon the instructions were as to the propriety of those which were in fact given, we find the doctrine now presented was distinctly recognized in the opinion.    Said the court upon the former appeal, considering testimony as to the acts and declarations of others who were either co-defendants or supposed to be co-conspirators:  "Of course, the testimony of neither of these witnesses has any bearing upon the guilt or innocence of the defendant, Howard, unless the Commonwealth, by other testimony, establishes a guilty connection between the defendant and Youtsey, and shows to the satisfaction of the jury either that he fired

the fatal shot, or was present and aided and encouraged Youtsey or another to do so." 61 S. W., 759. And again: "And on the trial of one of several defendants jointly indicted for an offense, the declaration of a co-defendant made in the absence of the defendant on trial, in furtherance of the common purposes, is admissible, when a *prima facie* case of conspiracy has been made out. To authorize the admission of such evidence, an express averment in the indictment of the fact of a conspiracy is not necessary. Goins v. State, 46 Ohio St., 457, 21 N. E., 476. 'But to make the declaration competent, it must have been in furtherance of the prosecution of the common object, or constituted a part of the *res gestae* of some act done for that purpose.' 1 Tayl. Ev. p. 542, section 530," 110 Ky., 356, 22 R., 854, 61 S. W., 759. And again: "It seems to us that these declarations of Youtsey come within the rule laid down in these authorities, and are competent evidence to go to the jury. But it must not be forgotten that the defendant's guilt, as principal or accessory, can only be finally established by evidence of his own acts. Wright, Crim. Conspiracies, 69, 71; Steph. Dig. Cr. Law, art. 39," 110 Ky., 356, 22 R., 832, 61 S. W., 759. Under these principles, it follows that, while the particular instruction asked upon this subject should not have been given, the law should have been stated to the jury. If a conspiracy had been alleged in the indictment, it would undoubtedly have been necessary to instruct the jury as to the extent and the circumstances under which evidence of the acts and declarations of co-conspirators were to be received against the accused. Such an instruction is universally required and given in all cases where conspiracy is charged. Where, as in this case, a conspiracy is not charged, but nevertheless the Commonwealth is permitted to introduce evidence that a conspiracy

Howard v. Commonwealth.

existed, that the accused was a member of it, and that various persons who are claimed to be co-conspirators did acts and made declarations in furtherance of the purpose of such conspiracy, it follows inevitably that the jury should be told, in effect, how far and under what circumstances they could consider evidence of the acts and doings of the co-conspirators as evidence against the defendant on trial. Some such instructions should have been given as was given in the Powers Case (110 Ky., 386, 22 R., 1837) 61 S. W., 735, 53 L. R. A., 245: "If the jury believe from the evidence, beyond a reasonable doubt, that a conspiracy was formed between the defendant . . . Henry Youtsey,

. . . or either or any of them, or with others to the jury unknown, acting in concert with them, or either of them, to kill William Goebel, then, after the formation of said conspiracy, if any, every act and declaration of each of the conspirators, done or said in furtherance of the common design, before the consummation thereof, became the act or declaration of all engaged in the conspiracy." It is therefore not necessary to consider whether this court has power to review its own decision upon a second appeal. The rule that the law as declared on the first appeal is the controlling principle of the case on the second appeal is recognized, whether such rule be regarded as an application of the doctrine of res judicata or of stare decisis, or simply what is called in Van Fleet on Former Adjudication a rule "of expediency, which is not to be lightly disregarded." There is considerable conflict of authority upon this rule, but as said by Mr. Aiken in the article on "Appeals" in 2 Enc. Pl. & Prac., p. 381: "The principle is sharply limited to decisions on a prior appeal on points necessary to a determination of the cause. On matters not essential,

or questions incidental or not considered, the court is not conclusively bound on the second appeal." On the former appeal of this case the question was as to the errors complained of. The questions were whether the errors complained of were reversible. It was held that certain of those erorrs were reversible, and the judgment was reversed. Other matters complained of were held to be error. This question was not presented or considered, but the lagal doctrine applicable was considered and announced, and should have been followed by the circuit court.

Considerable argument is devoted to the proposition that the law presumes the accused to be a person of at least ordinary good character; that this presumption continues throughout the case, and is evidence in favor of the accused; and that an instruction should have been given upon this subject. As an abstract proposition of law, there is no doubt of the correctness of the proposition, which is supported by innumerable authorities. Whether it should be given in an instruction to the jury is another question. The only authorities cited upon the proposition that an instruction upon this point must be given are cases in the federal courts (McKnight v. U. S., 38 C. C. A., 115, 97 Fed., 210; Mullen v. U. S., 46 C. C. A., 22, 106 Fed., 894), and a case from Texas (Stephens v. State, 20 Tex. App., 255), in which case last named it was held that as counsel for the State improperly discussed the character of the defendant, which was not put in issue, the court should have given the jury a special charge upon the subject of good character, in order to prevent, as far as possible, any prejudice to the defendant by reason thereof. As to the cases in the federal courts, in one of which the case was reversed because of comments by the district attorney similar to those condemned in the Texas case, it must be remembered

Howard v. Commonwealth.

that the federal courts follow the English practice as to charging the jury. The judges comment at length upon the testimony, and advise the jury specifically as to the weight and credit which should be given to particular parts of it. While it might be eminently proper, under that system of charging the jury, to say to them that the accused was presumed to be a person of at least ordinarily good character, and that this presumption continues throughout the trial of the case, such a procedure is unheard of under our system, and its adoption by this court would necessitate the reversal of nearly every Commonwealth case. A contrary procedure seems to be well established, and we do not think the refusal of the trial court to instruct as requested was error.

For the reasons given, the judgment is reversed, and cause remanded, with directions to award appellant a new trial, and for further proceedings consistent herewith.

Judge Guffy concurs in the reversal for the sole reason that the court did not give the instruction indicated in the opinion, but holds that no other error was committed by the court to the prejudice of the appellant. Judges Paynter, White and Hobson dissent.