CASE 6—INDICTMENT—JULY 16.

# Champ vs. Commonwealth.

APPEAL FROM FAYETTE CIRCUIT COURT.

2me 17
122 880

1. The right of a party to contradict his own witness, by showing that " he has made statements different from his present testimony," (*Civil Code*, sec. 660,) does not depend upon the ability of the party to prove, in addition, that the testimony of the witness is untrue. But he may contradict him *first* by other evidence, and *secondly*, by showing that he has made statements different from his present testimony. Either or both of these modes may be adopted.

VOL. 2—3.

Champ vs. Commonwealth.

2. A party introduces a witness to prove certain facts, but the witness deposes that they did not transpire. He cannot, by way of discrediting the witness, prove by others that the witness had on another occasion, in their presence, stated the facts in question—in effect to show that his witness had stated out of court facts which he failed to prove in court.

3. Where a witness does not state any fact prejudicial to the party calling him, but only fails to prove facts supposed to be beneficial to the party, it is not a case within the reason or policy of the rule which allows the witness to be contradicted by evidence that he had previously stated the same facts to others.

4. To authorize the reversal of a judgment of conviction for felony, upon the ground of the rejection of evidence offered on the part of the defendant, it is not sufficient that the rejected evidence be shown to have been merely pertinent or relevant, or technically admissible—it must be *important* for the defendant, in view of the whole case as presented.

5. See the opinion for a detail of the circumstances under which, though rejected evidence offered by the defendant in a criminal case be conceded to be admissible, it was held not *important*, and its rejection not prejudicial to him nor ground for reversal

6. The opinions of experts upon questions of art or science, to be admissible as evidence, must always be predicated upon and relate to the facts established by the proof in the case. Mere professional opinions upon abstract questions of science, having no proper relation to the facts upon which the jury are to pass, tend to lead their minds away from the true and real points of inquiry, and should therefore always be excluded. [See the opinion for a state of case illustrating the principle.]

BRECKINRIDGE and BECK, for appellant, cited 1 *Hale's P. C.*, 635; 3 *Greenleaf*, sec. 212, *p.* 193; *Civil Code*, sec. 660; *Ray's Med. Jur. of Insanity*, sec. 135, *p.* 160; *Fonblanque's Equity*, side page 449, *note;* 4 *Binney*, 326; 2 *Yeates*, 93; 1 *Dallas*, 47; 1 *Greenleaf*, sec. 440, and authorities there cited.

ROBINSON & JOHNSON, on same side.

J. W. MOORE, on same side, cited *Civil Code*, sec. 660; *Wharton & Stillie's Med. Jur.*, top page 77, and authorities there referred to; note 529 of *Cowen & Hill's notes* to part first of 2d *Phillips on Evidence;* 1 *Starkie Ev.*, top page 154; 1 *Greenleaf*, top page 492; 7 *Met.*, 500; *Wharton's Am. Law of Homicide*, 241–2; *Ray on Insanity*, secs. 27, 28.

A. J. JAMES, Attorney General, for Commonwealth, cited *Civil Code*, sec. 657; *Deane's Med. Jur.*, *p.* 626.

G. W. WILLIAMS, on same side.

JUDGE DUVALL DELIVERED THE OPINION OF THE COURT:

Robert H. Champ was indicted for a rape, committed upon the person of Mrs. Sally Champ, in June, 1858.

He was found guilty, and, in conformity with the verdict of the jury, was sentenced to confinement in the penitentiary for fifteen years.

He has appealed to this court, and seeks a reversal of the judgment of conviction upon the single ground that the court below erred to his prejudice, in excluding certain evidence offered by him on the trial.

To a proper understanding of the questions to be considered, a notice of some of the testimony is necessary.

Mrs. Champ was the first witness introduced by the Commonwealth. She stated in substance that she was the widow of Thomas J. Champ, who was a brother of the accused, and who had been dead about six years; that she was about twenty-eight years of age; that the accused came to her house on a Tuesday in the month of June, about eight o'clock in the morning, there being then no one at home except herself and her youngest daughter, a negro woman, and a negro girl; that after sitting together a short time in the hall, Champ said he had come to see her new window blinds, his wife wishing to get some like them; that he expressed a wish to see the blinds, and they both went into the parlor, she going to the front window and opening a shutter; he went to the back window, and as he went, he pushed the door to. He seemed to be examining the blinds, having pulled aside the curtains. She went to where he was, took hold of one of the cords, raised the blind up and down, then reached across and took hold of the other cord, and showed him how it worked. "He said, the blinds were pretty, but not so pretty as you are. I did not say a word, but turned and started to go out. As I was about to take hold of the knob of the door, he caught me in his arms. He had a vial in his hand; I screamed twice; he grasped my left arm with his right hand, and with his left he put the vial to my nose; I remember nothing more till it was too late." She further stated that her consciousness returned before the completion of the act of violence; that she rose from the floor and fell in the hall, Champ passing out by her; she then rose partly, and fell again in her own room; a servant girl came in and threw water in her face, and she told the girl to go for her

father and mother, as she did not think she could live, and to go for her nephew, Thomas Brand, who was at work in the field. Brand soon came in, and asked her what was the matter? She replied, that Champ had ruined her. Champ then came in, and said to Brand, " You see, Thomas, she is crazy; she is the craziest woman you ever saw." She told Champ that he knew that she was not crazy, and knew what he had done; ordered him to leave the house, and never come in it again, and that she did not see him again. That Mrs. Martin, Miss Martin, and Mrs. Turney, soon afterwards came in, and that they, in the evening, examined her person.

In a previous part of her statement the witness related an incident that occurred on the Saturday preceding the day of the occurrence. She and her children went by Champ's house on their way to a picnic and school celebration in the neighborhood. She and Champ rode together in her buggy from his house to the picnic, and that, as they were going on, he remarked that she was wearing a pretty bonnet, and that she was a pretty woman, and he wished she was his wife; that she expressed indignation at the remark, when he asked her if she could not take a joke, and said he would not joke again in that way.

On cross-examination, she stated that Champ was one of the administrators of her husband, and that until the incident just mentioned his conduct towards her had always been that of a gentleman and a brother-in-law. She said she did not know what was in the vial, and did not notice any smell; that she was weak from fright, and did not know how long he held the vial to her nose; that all seemed as if it were done in an instant, nor did she know when she fell; and did not know what the vial contained. She further stated, that on Monday night, before the occurrence, she dreamed that Champ had stabbed her, and told the dream next morning at breakfast to her nephew, Brand, remarking at the time that it was strange a person should have such a dream about their best friend; that the dream made no impression. That about a year previously, a gipsy had called at her house, and had told her sister that a brother-in-law of the witness would seek to do her an injury;

that she learned this from her sister; but the story had made no impression upon her, as she did not believe in such things. She also spoke of having heard a noise the night before in an attic in which she kept groceries, some of which had been previously stolen, and she thought, on hearing the noise, that some of her servants might be up there taking them. She and her nephew went up into the attic and found that the noise had been occasioned by a plank that a cat had thrown off a barrel of sugar. She stated that she had never had an hysterical, or any other description of fit, in her life; that she never had had any delusion, had never had any disease in her female organs, and that her monthly courses had always been regular.

Mrs. Martin and Mrs. Turney proved facts tending to corroborate the testimony of Mrs. Champ. They stated that they reached her house soon after the occurrence, and found her laboring under great suffering, physical and mental; that they made an examination of her person and of her garments; that there were bruises on her forehead, in the direction of her temple, and marks of violence on the left arm, like the impression of fingers across the arm; that her organs of generation were swollen and bruised, exhibiting evidences of violence; that there were stains and spots upon her linen, the cause and character of which were stated by the witnesses; that Mrs. Champ complained of great soreness, and applications suitable to reduce the inflammation and allay the pain were made to the bruised and swollen parts. These witnesses also concurred substantially with Mrs. Champ in her statement of the declarations made by the accused at the time, to the effect that Mrs. Champ was crazy.

Numerous witnesses, and among them a sister and other female relatives of Mrs. Champ, proved that they were well acquainted with her, and that she had never been afflicted with hysteria, or with delusions of the mind, or with any disease of the female organs; but that, on the contrary, she had enjoyed uniform good health, both of mind and body.

No attempt was made upon the trial to assail the character or veracity of Mrs. Champ. So far as the record shows, it seems to have been conceded there, as it was in argument here,

that her character was in all respects unimpeachable, and that she at least believed that her own precise, consistent, and apparently impartial history of the transaction, was true. The theory of the defense relied upon was, that she was laboring under a sudden attack of hysteria, or of some mental delusion, the result of a diseased condition of the genital organs. For the purpose of establishing that defense, several physicians were called on for professional opinions, the exclusion of some of which by the circuit court forms the chief ground of complaint here.

The point first to be considered, however, relates to a question of practice arising upon the construction of *section* 660 of the *Civil Code of Practice*, which is made applicable to criminal cases. The section is as follows:

" The party producing a witness is not allowed to impeach his credit by evidence of bad character, unless it is a case in which it was indispensable that the party should produce him; but he may contradict him by other evidence, and *by showing that he has made statements different from his present testimony.*"

It is insisted that the circuit court erred in refusing to allow the prisoner to prove, by Webster and Martin, that Thomas Brand, on the day of the alleged rape, made statements to each of them variant from his testimony on the trial.

Thomas Brand is the person referred to in the testimony of Mrs. Champ as her nephew. On the examining trial he was called as a witness on the part of the Commonwealth; but the attorney for the Commonwealth declined introducing him on the trial in the circuit court. He was introduced by the prisoner as a witness, and detailed the conversation he had with Champ immediately after the occurrence, in which Champ told witness that his aunt was crazy; that she had accused him of putting a vial to her nose; that she had a fit and fell on the floor. He stated that his aunt had him up only once the night before, and that he and she went up to the attic and found the plank knocked off the sugar barrel, which had caused the noise. He said he did not tell Champ that his aunt had him up more than once that night; nor did he tell Champ his aunt was crazy; nor did he tell Martin or Webster, at Millersburg, that

his aunt had him up two or three times the night before, because she thought there were men in the house; nor did he say to them that he thought she was crazy, or that her conduct was strange, or anything of that sort. All these statements appear from the record to have been made by the witness, on the interrogation of the prisoner.

The prisoner then offered to prove by Martin and Webster that they heard Brand state in Millersburg, on the day of Champ's arrest, that his aunt had had him up two or three times the night before, she being of the impression that there were men in the house; and that Brand then said he believed his aunt was crazy the night before, and that she acted very strangely.

To this evidence the Commonwealth objected, the court sustained the objection, and the prisoner excepted.

We do not concur, altogether, with the circuit judge in his exposition of the section of the Code above quoted. We do not think that the right of a party to contradict his witness, by showing that " he has made statements different from his present testimony," depends upon the ability of the party to prove, in addition, that his testimony is untrue. This section was intended to provide two different modes in which the party producing a witness may contradict him; *first*, he may contradict him by *other evidence*, and *secondly*, by showing that he has made statements different from his present testimony. Either or both of these modes of contradiction may be adopted by the party, and he would not be denied the privilege of showing that his witness had made statements different from his present testimony, merely because he might be unable to contradict his witness by other testimony.

But we are satisfied that the ruling of the judge in excluding the evidence was right, upon other obvious grounds. The witness states, on the examination of the party calling him, a fact that transpired the night before the occurrence; he is then interrogated by the same party as to the existence of two other and additional facts: 1, that his aunt had him up two or three times that night, she believing there were men in the house; and 2, that he told Champ the next morning that his aunt was

crazy. He testifies that neither of the two facts existed—that his aunt did not have him up two or three times, &c., and that he did not tell Champ his aunt was crazy. Thereupon the party whose witness he is, proposes to show, by way of discrediting him, that he had, on another occasion, and in the presence of others, stated the two facts which he says upon the trial did not transpire. The effort was substantially and in effect to show that the witness had stated, out of court, facts which he failed to prove in court. Now suppose the rejected testimony of the two witnesses had been admitted, what would have been the legal effect of it? To prove affirmatively that the two facts in question did transpire, and thereby transform those facts into substantive testimony for the accused? Such might, and probably would, have been its effect, if admitted, upon the minds of the jury; but it certainly was not legitimate for any such purpose. It follows that the case of the prisoner was not prejudiced by the rejection of the testimony which was excluded by the court. For had it been admitted, the legal consequence would have been simply that his witness stood discredited before the jury, and that the jury would have been authorized, upon that ground, to disregard his entire testimony.

Prior to the adoption of the Civil Code, a party who was surprised by the testimony of his own witness, was allowed to contradict him only by proving that the *fact* stated in evidence was different. By the Code, as already shown, an additional means of contradiction is allowed—it may be shown that the witness has made statements different from his present testimony. The obvious meaning of the rule is, that where a witness states a fact prejudicial to the party calling him, the latter may be allowed to show that such fact does not exist, by proving that the witness had made statements to others inconsistent with his present testimony. But a case like the present, where the witness does not state any fact prejudicial to the party calling him, but only fails to prove facts supposed to be beneficial to the party, is not within the reason or policy of the rule, and the witness cannot be contradicted in such case by evidence that he had previously stated the same facts to

others. Such a practice would be a perversion and abuse of a rule which was intended to protect a litigant against the fraud or treachery of a witness whom he may have been induced to confide in, and would lead to consequences more injurious than the evils the rule was intended to remedy.

2. The ground of reversal next relied upon is, that the court below erred in refusing to allow the physicians who were introduced by the appellant to give their professional opinions upon the points which will be stated hereafter.

This point involves two matters of inquiry : *First,* whether the professional opinions of the witnesses alluded to were admissible as evidence; and, *secondly,* whether, if deemed admissible, the exclusion of them by the court was such an error as, upon the facts of the case, and the law regulating appeals in criminal cases, constitutes a ground of reversal here.

The view we have taken of the second of these two questions will render it wholly unnecessary to consider or decide the first.

Prior to the adoption of the " Code of Practice in criminal cases," appeals from judgments of conviction in cases of felony had never been allowed in Kentucky. And it is a part of the well known history of the country, that the provision contained in the present constitution, which gives to the General Assembly power to pass laws authorizing writs of error in criminal and penal cases, encountered a very serious opposition. It was feared and urged, that such a change in our system of criminal jurisprudence would tend greatly to obstruct the administration of justice, by multiplying the chances for the guilty to escape punishment, by reason of trivial and technical errors, not affecting the substantial justice of the case, and which cannot in the nature of things be well avoided in the trial by jury in the circuit court.

It was, doubtless, in view of these well founded objections that the legislature thought proper to subject the revisory power of this court over judgments of conviction for felony to the limitations and restrictions with which all the provisions of the Criminal Code, regulating appeals in such cases, are so cautiously guarded.

A judgment of conviction can only be reversed for errors of law *to the defendant's prejudice* appearing on the record. But the jurisdiction of this court does not extend even to all errors of law to the defendant's prejudice. The error must be within one of the four following classes :

1. An error of the circuit court in admitting or rejecting *important* evidence.

2. An error in instructing or in refusing to instruct the jury.

3. An error in failing to arrest the judgment.

4. An error in allowing or disallowing a peremptory challenge. (*Criminal Code.*)

As has been before stated, all the grounds relied upon for reversal in this case are embraced by the first of the four classes enumerated. Unless it appears on this record, therefore, that the circuit court has committed an error to the prejudice of the appellant, by rejecting *important* evidence offered by him, the judgment of conviction must stand. It is not sufficient that the rejected evidence be shown to have been merely pertinent or relevant, or technically admissible. The Code of Practice is characterized by great precision and accuracy of expression; and hence the word *important* must be presumed to have been used with especial reference to its plain signification, and to the distinction it establishes between evidence which is deemed merely *admissible* under the rules of law, and evidence which is to be deemed *important* in view of the whole case as presented.

We proceed to inquire, briefly, whether any of the supposed errors relied on by the appellant are within the rule, as thus expounded :

1. The accused offered to prove by Dr. Peckover, a dentist, the same facts which had been already proved by three other witnesses of the same profession, and that, since the occurrence under investigation, the witness had made experiments with chloroform, the result of which was that this article could not be given from a vial so as to produce insensibility. This evidence was rejected, and, we think, properly rejected.

The three other dentists mentioned (Stone, Talbott, and Driggs) had just before stated fully their opinions as to the

properties and effects of chloroform—those opinions being founded on experiments—and they concurred in all respects with those offered to be proved by Dr. Peckover. And it appears, moreover, that at the close of their testimony, the attorney for the Commonwealth announced that he did not contend, or intend to do so before the jury, that chloroform, or any other anasthetic, had been administered at the time of the alleged rape, or to offer any evidence contradictory of that already given.

It certainly cannot be said, under these circumstances, that the court abused its discretion in stopping the introduction of further evidence on this point. (*Civil Code, sec.* 657.) It may be conceded that the testimony of this witness was admissible; but it was not important, and its rejection was not, therefore, prejudicial to the appellant.

2. Dr. Letcher was asked if, in his opinion, diseases and deranged action of the womb do not cause delusions of the mind; and the refusal of the court to permit the witness to answer the question, is complained of as erroneous.

Whatever diversity of opinion there may have been in relation to the admissibility of the opinions of experts upon questions of art or science, it is agreed on all hands that such opinions, to be admissible, must always be predicated upon and relate to the facts established by the proofs in the case. Mere professional opinions upon abstract questions of science, having no proper relation to the facts upon which the jury are to pass, evidently tend to lead their minds away from the true and real points of inquiry, and should, therefore, always be excluded.

The defendant had not only failed to prove that Mrs. Champ was at the time laboring under any disease, or deranged action of the womb, but facts were proved on the part of the prosecution which excluded any reasonable deduction that such disease or diseased action did exist. The facts alluded to are to be found in the testimony of Mrs. Champ herself, and of her female relatives and friends and neighbors, who had known her long and intimately, and who place this matter of fact beyond question. Mrs. Champ states, it is true, that her cata-

menial effort had closed the Sunday preceding the alleged act of violence, and that the act was followed by a resumption of her courses. And from these premises, so inadequate and unsatisfactory, a succession of doubtful inferences was sought to be established, by professional opinions, until the remote and conjectural conclusion could be reached that Mrs. Champ became suddenly the subject of an extraordinary mental delusion, and that the fearful scene described by her with so much precision and minuteness of detail was but the creation of that delusion. Upon the facts of this record we cannot entertain a doubt that the opinions of this witness upon the point in question were properly excluded from the jury.

But little remains to be said upon the other questions arising upon the rejected evidence. The same witness was asked for a professional opinion as to whether a rape committed upon a person of the description stated in the question, would or would not probably produce external swelling of the organs of generation. Whether the refusal of the court to allow an answer to be given to this question was such an error as to authorize a reversal, depends of course upon the admissibility and importance of the answer which may have been given. The witness stated that he never knew of such a case. But let it be conceded that that fact formed no objection to the testimony, and let it be further conceded that the subject to which the interrogatory referred was a matter of science, a question lying " beyond the scope of the observation and experience of men in general, but quite within the observation and experience" of the witness whose profession and pursuits may have brought " that class of facts frequently and habitually under his consideration"—such being the conditions upon which professional opinions are generally held admissible—still we are of opinion that the court did not err to the prejudice of the defendant in refusing to allow an answer to the question. The act of violence was proved by Mrs. Champ to have been committed. Two of her female friends and neighbors soon afterwards made an examination of her person; found bruises upon her forehead and upon her arm, and found the organs alluded to not only swollen, but *bruised.* In the face of this proof, it is

clear that the mere opinion of a professional witness, to the effect that the cause stated in the question would not *probably* have produced one of the two effects which had been proved to have been produced, would have been entitled to little or no weight upon the question of the guilt or innocence of the accused, the more especially as the witness did not profess to have had any knowledge in regard to the matter, derived either from observation or experience. The evidence excluded by the ruling of the court upon this point, even if admissible at all, was, therefore, immaterial, and *unimportant*, and could have had no material or important bearing upon the result.

What has already been said applies to several other exceptions to the ruling of the court in excluding professional opinions, and those exceptions need not therefore be further noticed.

We would not be understood as expressing or even intimating any opinion as to the propriety of the verdict upon the whole of the evidence in the case. That is a question with which we have nothing to do. The copious references to the evidence which have been made, were rendered necessary by the nature of the questions presented. The admissibility of the excluded evidence, as well as its importance, depended in a great degree upon the state of fact as made out by the proof.

A careful and patient examination of the record has satisfied us that the circuit court, in the various rulings excepted to, committed no such error to the prejudice of the appellant as to justify this court in reversing the judgment of conviction.

The judgment is therefore *affirmed*.