## Duke v. Commonwealth.

(Decided March 25, 1921.)

### Appeal from Christian Circuit Court.

1. Homicide—Threats.—Although one has been menaced or threatened, he can not hunt up his adversary and kill him, and be guiltless.

2. Witnesses—Contradiction Upon Collateral Matters.—A witness can not be contradicted as to statements made by him concerning collateral matters, and if a party inquires of a witness about a collateral matter, he must abide by his answer.

3. Criminal Law—Witnesses.—If a witness does not testify to substantive facts, proof of such substantive facts can not be made by proving that the witness has made a statement out of court, that they did occur.

4. Witnesses—Impeachment.—The impeachment of a witness, by proving that he has made statements, out of court, inconsistent with the statements made by him as a witness must be restricted to statements made by the witness on the trial, which are relevant to the issue.

5. Evidence—Production of Documents.—The contents of written documents, in the absence of a showing, that they are not in existence, can only be proven by their production and inspection.

6 Criminal Law—Indictment as Evidence.—The introduction of an indictment in evidence does not prove anything, except its own existence, and does not prove the truth of any fact upon which it is based.

7. Criminal Law—Self-Defense—Instructions.—An instruction upon the right of self-defense which submits to the jury, at the trial, whether an actual necessity existed for a homicide, or whether the force made use of by the accused was actually necessary is erroneous. The right of one assailed to take life, in his self-defense, depends upon the good faith of the accused, in the exercise of a reasonable judgment at the time and place of the occurrence and under the circumstances, as they appear to him, that the necessity exists to slay his adversary to save himself from death or serious bodily harm.

JAMES BREATHITT and BREATHITT & BREATHITT for appellant.

CHAS. I. DAWSON, Attorney General, THOS. B. McGREGOR, Assistant Attorney General, and TRIMBLE & BELL for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE HURT—Affirming.

The appellant, Stanley Duke, upon an indictment accusing him of the crime of murder, by shooting and

killing Alex Wells with a pistol, was found guilty of voluntary manslaughter, and his punishment fixed at imprisonment for the period of fifteen years, by the verdict of the jury, and a judgment was rendered accordingly. His motion for a new trial being overruled, he has appealed.

The grounds upon which he assails the fairness of his trial, are that:

1. The court erred to the prejudice of his substantial rights in the admission of testimony which was incompetent as evidence against him.

2. The court erred in excluding competent evidence in his behalf.

3. The court erred in the instructions to the jury.

The above stated grounds for reversal will be considered in their order, but before doing so it will be necessary to give as condensed a statement as practical of the salient facts established or attempted to be established by the evidence, and the contentions of the parties with reference thereto in order to make the discussion of the grounds relied upon for the reversal of the judgment, intelligible.

The appellant was a young man thirty-three years of age, a farmer, and a manufacturer of illicit distilled spirits, and who, also, went around in his community habitually armed, the weapon with which he committed the homicide being an automatic pistol which could be discharged in rapid succession nine times before recharging. This weapon, however, he claims to have habitually carried upon his person to protect himself from apprehended violence at the hands of his victim, Wells, who resided three or four miles away. The victim, Wells, bore an unsavory reputation as being a dangerous character when aroused or drinking, and who, also, went about habitually armed, and when slain had a revolver concealed upon his person. He had served a term in the penitentiary at Eddyville for a felony. At some time or other he had been shot in the leg, which stiffened his ankle and made him slightly lame in walking, and the appellant had, also, suffered a gun shot wound, which he claims had lessened his ability to do manual labor. The accused and Wells were enemies of several years standing, but, the record does not disclose the original cause of their mutual animosity. There was evidence to the effect, that each of them had threatened the other with death. About three years before the hom-

icide, Wells threatened, that he would kill the accused, if he (Wells) should return from the penitentiary, to which he was expecting to be and was sentenced, within a few days, thereafter, and after his return, threatened that he would kill the accused, if he should "cross his path," though he expressed his willingness to be civil with him. The accused threatened to kill Wells, if he (Wells) should ever discover him (accused) in the making of whiskey. The threats of Wells were communicated to the accused, one of which was communicated to him on the morning of the day of the homicide. Other language, made use of by each of them, proves their mutual hatred, and especially expressions of the accused made just after he had killed Wells, which indicate his hatred of him and his gratification at having killed him. There was other evidence which tended to prove that on two occasions, shortly before the homicide, they met upon terms of apparent friendliness—once, near the dwelling of Wells, when the accused, who was passing, called to Wells, and they went away together for fifteen minutes, and on another occasion, when Wells visited the distillery of the accused, where the accused and Roy Overton were, and remained two or three hours, and accused presented him with three quarts of "singlings." The accused resided near his father's, John Dukes' grocery, or "soft drink stand," and on the day the homicide occurred, a crowd had congregated thereabouts, and about twelve o'clock, in the day, the accused and Roy Overton were seen coming from the home of the accused, in the direction of the grocery, and there was testimony to the effect, that the accused inquired where Wells was, and being informed that he had gone in the direction of the "hollow," which was a rendezvous for gambling, they passed on in that direction, and within about thirty minutes the shooting was heard, which caused the death of Wells, in the "hollow." The accused denies, that he inquired or received any information about Wells, and did no go directly to the "hollow" but stopped at the grocery for an hour and a half, but, it is significant, that no one corroborates him in this statement except Roy Overton, although he mentions the names of persons with whom he conversed at the grocery. Roy Overton claims, that he passed on by the grocery, and was walking aimlessly about, and heard talking in the "hollow," and proceeding to it, found Wells and Robert Slaughter there. Overton and Wells engaged in a game of cards,

while Slaughter lay down and fell asleep. Elmer Overton was, also, walking aimlessly about, and discovered the group and sat down near by and watched the game. Roy and Elmer Overton were uncles of the accused. The accused claims that he left the grocery in search of his horses, for the purpose of feeding them, and while searching for them, heard voices in the "hollow" and drew near to them, and as he came around a bluff within eight or ten steps of the parties, discovered the presence of Wells for the first time, when Wells immediately started to arise, placing his hand in the direction of his hip, and said, "G—d d—n you, I am going to get you." The accused instantly drew his automatic pistol, and discharged it nine times against Wells, who fell down and died, and Slaughter and the Overtons ran away, at the first shot. The Overtons corroborate the accused, as to what took place at the time, while Slaughter deposed, that when he was awakened by the shooting, Wells was upon his knees and the accused was shooting him. All nine of the bullets took effect. Five entered Wells' face, three nearly together upon one side of his face, and two upon the other, one entered his forehead, in the edge of his hair, another passed through a finger of his hand, another wounded his thigh, and the remaining one glanced his right shoulder. There was testimony to the effect, that shortly after the homicide, the accused said to one, that he approached the game and Wells invited him to join in it, and he replied, that he would not play with a d—n son of a b—h, and to another he said, that he walked up to the parties in the game, and then went away, and then returned to it again. The body of Wells was examined and a large pistol was found concealed upon it, partly incased in a scabbard, which was attached to a belt, which encircled his waist, and was worn under a pair of overalls.

The theory of the prosecution is, that the accused, prompted by hatred or fear, or probably both, sought out the deceased, provoked a quarrel with him and shot him to death to gratify his malice toward him, while the accused claims, that he came upon the deceased suddenly, and without knowledge of his being at the place, when deceased with a threat to kill him started to do so, when he, from his knowledge of the animosity of deceased toward him, his previous threats to do him violence, his known character for violence, and his apparent purpose to carry the threats into execution, believed in good

faith, that he was in imminent danger of death or serious harm at the hands of deceased, and had reasonable ground for such belief, and killed him to protect his own life. It is clear, that if the theory of the prosecution is founded in truth, the accused was properly convicted, for although one has been menaced and threatened, he can not hunt up his adversary and kill him and be guiltless. Parsons v. Com., 78 Ky. 102; Martin v. Com., 93 Ky. 189. It is, also, clear, that if the theory of the defense is the truth of the matter, the accused is guiltless on the ground of apparent necessity. This was the issue submitted to the jury, which resulted in a finding adverse to the claims of the accused.

(a)   After Elmer Overton had testified as a witness for the appellant, the Commonwealth's attorney introduced a witness, who as a stenographer, had taken shorthand notes of a conversation between the county attorney and Overton, a short time after the homicide, in regard thereto, and over the objections of the accused was permitted to prove by the stenographer, statements made by Overton to the county attorney in regard to the homicide, which were inconsistent with and contradictory of certain statements made by him upon the trial, and it is now insisted that the evidence of the stenographer was incompetent upon the ground that the statements made upon the trial, which were proposed to be contradicted, were concerning immaterial and collateral matters, and, also, that it was an undertaking to prove and make substantive testimony of the occurrence of certain facts by proving that the witness in the conversation had with the county attorney, had stated that certain facts occurred, the occurrence of which the witness denied upon the trial. That the credibility of a witness may be impeached by proving that on another occasion he has made a statement inconsistent with the one made by him upon the same subject upon the trial, is authorized by our Code of Practice, as well as the rules of the common law, is not questioned, but the right to impeach by proving inconsistent statements of the witness, is in all cases restricted to the contradiction of statements made upon the trial, which are relevant to the issue. The witness cannot be impeached by inquiring concerning collateral matters and then contradicting him in regard thereto. When a party asks a witness concerning a collateral matter, he must abide by his answer. Loving v. Commonwealth, 80 Ky. 511;

Champ v. Commonwealth, 2 Met. 24; Saylor v. Commonwealth, 33 S. W. 185; Kennedy v. Commonwealth, 14 Bush 340; Cornelious v. Commonwealth, 15 B. M. 539. From an examination of the evidence of Elmer Overton, and that of the contradicting witness, it does not appear that any statement made by Overton upon the trial, which was sought to be contradicted by the stenographer, was irrelevant to the issue or about a collateral matter. It should be borne in mind that it was not the statements which the witness made to the county attorney which were sought to be contradicted, but the statements made by the witness upon the trial. It is, also, very well settled that a witness, who fails to testify to substantive facts, can not be contradicted by asking him if he has not stated such to be facts to persons out of court, and then proving that he has stated out of court, that such facts did exist, as such a procedure would transform mere hearsay into substantive testimony but, when a certain substantive fact has been proven by another witness and a witness is offered by the adverse party, who deposes, that the fact did not occur, it may be proven that he has made a statement out of court, that it did occur, for the purpose of affecting his credibility. The alleged infringement upon this principle complained of is, that upon the trial the witness deposed that appellant had not said anything and had just come into sight of Wells, and was about eight or ten steps away when Wells started to arise and reach for his pistol, and said "G—d d—n you, I am going to get you." He was asked if he didn't state to the county attorney that appellant walked up to where the playing was in progress and requested to be permitted to engage in the game, and that deceased, with an oath, said no, we can not both play in the same game. The latter question could not be asked nor the statement which he made to the county attorney in answer to that question be proven, for the purpose of proving that the fact stated in the answer occurred, but the proof of what he said in answer to the county attorney was clearly contradictory of the version of the difficulty given by the witness upon the trial, and was competent to be proven and considered as affecting his credibility. We do not understand that any attempt was made to contradict the witness with reference to the statements he made on the trial to the effect that Wells said, "G—n d—n you, I am going to get you," but the statements he

made as to that declaration being the first thing that occurred, and that such was what precipitated the shooting was the subject of the contradiction. The court having admonished the jury, as to the purpose for which it might consider the evidence of the contradicting witness, there was nothing prejudicial to the substantial rights of the accused arose from its admission, although certain immaterial statements of the witness made out of court were proven to the jury, which were not contradictory of anything said by him upon the trial, and therefore did not tend to impeach him, and were therefore harmless.

(b)   The ruling of the court, in excluding testimony offered by him, of which the accused complains, is that he offered to prove by the clerk of the court, that prior to the killing of Wells, in the year 1916, Wells was indicted, convicted and committed to the penitentiary for the crime of accessory before the fact to the crime of shooting and wounding the accused. There is no pretense that the clerk had any personal knowledge of the shooting and wounding of the accused, or the connection of the deceased with it, and the offered evidence was doubtless excluded, and properly so, upon the well settled principle that the best evidence of a fact must be offered, and anything less than the best evidence within the power of a party to produce is not competent, and the only way to prove the existence and contents of records, which are in existence, is the production of same. The bill of exceptions, then recites that the appellant offered as evidence an indictment accusing the deceased of counseling and advising and paying Elgin Davis to willfully and maliciously shoot and wound the accused, but upon objection the reading of the indictment as evidence was excluded by the court. The indictment is copied into the bill of exceptions and it shows that the deceased was indicted for such a crime, and the name of the accused, as well as the names of five or six other persons, were endorsed upon it as witnesses. The record which must necessarily have been made as to the disposition of the indictment, was not offered, nor is it embraced in the bill of exceptions. Hence, the one question before us is the admissibility of the indictment as evidence, alone. It is very clear that an indictment, which is a mere accusation, would not be competent evidence to prove anything alleged in it, or anything beyond its own existence. If Wells did procure another to attempt to kill the accused, it is clear that the latter was entitled to prove such fact,

to show the probability of Wells having brought on the trouble, in which he lost his life, as well as the justification on the part of the accused to fear violence at his hands but such fact must necessarily be proven, if at all, by competent evidence, as any other fact is proven. The indictment alone would no more prove such fact than to have proven a declaration of some person, or of the accused himself made several years before, to that effect. In Martin v. Comth., 93 Ky. 189, Martin was upon trial upon an indictment charging him with the murder of Burke, and it was held that it was allowable to show a then pending indictment against Martin, for the robbery of Burke, with the name of Burke endorsed thereon as a witness, as evidence tending to prove a motive upon Martin's part for the murder of Burke. In McCandless v. Commonwealth, 170 Ky. 301, the accused was being tried for the murder of a party against whom, at the time of the homicide, there was an indictment pending for an assault upon the wife of McCandless, and upon the indictment, McCandless was endorsed as a witness, and the defense of McCandless for the slaying of such party being self-defense, it was held that it was competent to exhibit the indictment in evidence when it was shown that the party indicted knew of the existence of it, as conducing to prove a motive upon the part of such party to attack and kill McCandless. The indictment offered in the instant case against the deceased, seems to have been long before the trial of the accused disposed of, but there is nothing in the record to indicate, in a substantial way, what disposition was ever made of the indictment. In the cases of Martin v. Com., and in McCandless v. Com., it was held that it was incompetent to prove the facts upon which the indictments in these cases rested and the evidence in regard to them was restricted to showing that such indictments were pending, and that the other party was a witness thereon. But in the instant case the proof of such facts would have been competent evidence upon the principle that one pleading self-defense for homicide may prove lying in wait and attempted assassination of the accused by the deceased, as well as assaults made with the manifest intention to take life or do serious bodily harm. The mere production of the indictment, in the instant case, however, could not prove anything of the facts upon which it rested, and at most would have been evidence from which it might be inferred that a hos-

tile feeling existed between the parties, and that fact was so abundantly proven and admitted, that its exclusion if admissible at all was rendered absolutely harmless.

(c)    The fourth instruction is criticized as not defining correctly, the right of the accused to defend himself, under the state of facts, which according to his theory and insistence, existed at the time and place of the homicide.    It is insisted that the instruction made the right of the accused to kill the deceased depend upon whether or not in the opinion of the jury, the necessity existed for the actions of the accused and not upon the belief of the accused at the time.    It is furthermore, insisted that the instruction limited the force, which the accused might exert in his defense to what was necessary or appeared to the jury to be necessary for that purpose. If the instruction was subject to such interpretations, they would be fatal to its correctness, as a declaration of the rights of the accused, if the facts were such as he contends.    The decisions of this court are uniform in holding that the necessity for taking human life in self-defense, is not an actual necessity, as may appear to the jury at the time of the trial, but it is the necessity which the accused may, in good faith, believe, existed at the time and place, and the circumstances under which he acted.    The grounds upon which his belief is founded, however, must be such as would induce a belief of the necessity in a reasonable mind.    The force which one may exert in his self-defense, is not limited to the actual force necessary to effect it, but is limited to the force which appears to one when assailed, to be necessary, at the time and place, and under the circumstances which may appear to him to exist.    In the force exerted, however, he can not go beyond what appears to him in the exercise of a reasonable judgment to be necessary, and that can be no less than the taking of the life of his adversary, if in the exercise of a reasonable judgment such appears to him to be necessary. · Biggs v. Commonwealth, 164 Ky. 227; Heck v. Commonwealth, 163 Ky. 518; Tolliver v. Commonwealth, 161 Ky. 81; Reynolds v. Commonwealth, 185 Ky. 379; Wagner v. Commonwealth, 32 K. L. R. 1185; Austin v. Commonwealth, 28 K. L. R. 1087; Coyne v. Commonwealth, 29 K. L. R. 340.    The instruction complained of, though not aptly drawn, and has the fault somewhat of reiteration, substantially directed the jury to find the accused not guilty, if it believed, from the evidence, that, at the time

and place of the homicide, the accused in good faith believed, and had reasonable grounds for his belief, that he was then and there, in imminent danger of suffering the loss of his life or serious bodily harm, at the hands of the deceased, and that he made use only of such means, as, in the exercise of a reasonable judgment at the time and place, and under the circumstances, appeared to him to be necessary, to save himself from the impending danger, whether that danger was real or only appeared to him to be so from reasonable grounds. This appears to be the law of self-defense, and we do not think that the jury could have failed to so understand it.

There are, indeed in the record some minor errors, such as appear in nearly every trial by jury, but they were not such as to in any degree, in our opinion, effect the substantial rights of the accused.

The jury heard the evidence, and saw the witnesses. A conclusion that the homicide on the part of appellant was an unnecessary slaying finds support in the evidence, and we do not feel justified in disregarding the finding of the jury upon the facts.

The judgment is therefore affirmed.