### Farley v. Commonwealth.

Nov. 22, 1940.

James S. Forester, Judge.

F. M. Jones for appellant.

Hubert Meredith, Attorney General, and William F. Neill, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

At the trial of an indictment returned by the grand jury of Harlan County accusing him of murdering David Sullins, the appellant, Earl Farley, was convicted of voluntary manslaughter and punished by confinement in the penitentiary for 21 years. From the judgment pronounced on the verdict after his motion for a new

trial was overruled he prosecutes this appeal. The errors complained of and relied on for a reversal as classified in brief of appellant's counsel relate solely to the instructions of the court to the jury wherein it is argued that the self-defense and the reasonable doubt instructions were faulty and misleading, and also that the court should have instructed the jury "on the nature of the confession of appellant." No other objections are contained in the classification; although it is argued in the body of the brief that the court should have directed an acquittal upon the ground of uncontroverted proof (as alleged) that the killing of the deceased by defendant was excusable under the exercise of his right of self-defense. We will first dispose of the objections to the instructions.

The self-defense instruction says: "If the jury shall believe from the evidence that at the time the defendant shot Sullins, if he did so, he in good faith believed, and had reasonable grounds to believe, that he was then and there in danger of death, or the infliction of some great bodily harm, at the hands of said Sullins, and there appeared to defendant, in the exercise of a reasonable judgment at the time and under the circumstances, no other safe means of averting the danger, either real or to him apparent, except to shoot, wound or kill said Sullins, the jury will find the defendant not guilty." The criticism directed to it is in the use of the words "no other safe means of averting the danger," and the only case cited in support thereof is Lindon v. Commonwealth; 257 Ky. 746, 79 S. W. (2d) 202, 204. In that case the self-defense instruction was couched in language substantially the same as the given one in this case, except the word "safe" was qualified by the insertion of the immediately preceding word "reasonable." We criticised the use of that qualifying word in this manner: "The complaint directed to the above instruction is to the word 'reasonable' modifying the word 'safe.' It is argued that the word 'safe' being modified by the word 'reasonable' required appellant to choose an alternative method of escaping danger unless it promised absolute safety. In Tompkins v. Commonwealth, 117 Ky. 138, 77 S. W. 712, 25 Ky. Law Rep. 1254, a similar instruction was held by this court to be erroneous and that the word 'reasonably' modifying the word 'safe' was a qualifying word and a limitation upon

the judgment of the accused as to his right to act in self-defense."

We found no other objection to the instruction therein complained of, and which, we repeat, was and is the same, in substance, to the one herein given by the court and criticised by counsel with the exception of the qualifying word which we held should be omitted for the reasons stated in the inserted excerpt from that opinion. An examination of cases cited in the notes to Section 891 of the recent work of Stanley on "Instructions to Juries" will reveal that considerable discussion (more or less confusing and many times extremely technical) has been indulged in by this court as to the propriety of the use of the word "safe" when employed in the self-defense instruction, but an analysis of the opinions— practically, if not all of which are cited in the notes supra—will disclose that when the "safe means of escape" are those which appeared to the defendant in the exercise of a reasonable judgment on his part, then the phrase "safe means of escape" is not forbidden or erroneous because the safety of the means is made applicable to that which appeared to defendant in the exercise of his reasonable judgment in the immediate circumstances. It was not so in the given instruction in the Lindon case because it was left to the jury and not to the defendant to determine as to whether or not the means employed by the defendant (i. e., the killing of the victim) was or not reasonable, and it was for that reason alone that the instruction was held to be erroneous to the prejudice of the defendant in that case. Therefore, the only cases relied on to sustain the criticism now under consideration is insufficient for that purpose.

The criticised reasonable doubt instruction in this case says: "The jury are instructed that if there be a reasonable doubt of the defendant's being proven to be guilty, he is entitled to an acquittal." It is difficult to discover from the brief the precise objection to that instruction, since all that is said in brief in support of it is that "The instructions in the case at bar may have embodied the reasonable doubt idea, but they are confusing"—the plural pronoun "they" being employed because the same character of reasonable doubt instruction was given in directing the jury the degree of the homicide that it should return if it convicted defendant

but entertained a reasonable doubt as to which degree is proven. Section 238 of our Criminal Code of Practice says: "If there be a reasonable doubt of the defendant being proven to be guilty, he is entitled to an acquittal." The criticised instruction in this case is couched in that verbatim language and the notes to that section of the Criminal Code, Baldwin's 1938 Revision, are crowded with the citation of cases sustaining reasonable doubt instructions couched in the identical language of the Code section—three of the latest of which are, Shrout v. Commonwealth, 226 Ky. 660, 11 S. W. (2d) 726; Mink v. Commonwealth, 228 Ky. 674, 15 S. W. (2d) 463, and Nickells v. Commonwealth, 241 Ky. 159, 43 S. W. (2d) 697. It is, therefore, clear, that the criticism of the reasonable doubt instruction is also without merit.

The third and last criticism of the instructions—as argued by counsel for a reversal of the conviction of his client—is, in its entirety, that "The court also failed to instruct the jury on the nature of the confession of Farley made at the New Harlan Hotel; the question was raised as to whether the statement contained all that Farley said on that occasion, and whether it contained statements he did not make, and this question should have been submitted to the jury by proper instructions." We have had difficulty in trying to comprehend the exact meaning of that complaint, and which is not elucidated by anything found in either brief or record. Later, on the day of the killing, which occurred at about 1 o'clock A. M. on July 27, 1939, appellant was arrested in Evarts, Harlan County, Kentucky, and brought to the city of Harlan and placed under guard in a hotel where he, according to the undisputed proof, made a statement as to what happened at the time of the homicide and the circumstances under which it was committed, and which corresponds exactly with the testimony he gave on his trial, except on the latter occasion he testified that before he shot and killed deceased the latter placed his right hand on his (defendant's) shoulder immediately following which he (defendant) "stepped back" some two or three steps and began shooting. The written statement made, signed (and duly witnessed) by defendant at the hotel following his arrest did not contain the fact of decedent placing his hand on defendant's shoulder, and it would appear from the excerpt, supra, taken from counsel's brief (which is all it

contains on the subject) that it was the duty of the court to give some sort of instruction with reference to the conflict between the written statement by defendant at the hotel and his testimony as given on the trial, but what such an instruction should contain, or to what point it should be directed if given, are neither of them mentioned in brief, and we find ourselves in the condition of being wholly unable to supply either of those omissions. The entire evidence in the case was submitted to the jury, and which embraced that with reference to the contents of the statement, as well as defendant's added modification thereto, as given by him in his testimony, and we can conceive of no issue upon the point of difference that the practice requires to be submitted to the jury by a concrete or special instruction. No case is cited in support of any such contention, and we feel sure that none can be found. It results, therefore, that none of the classified arguments for a reversal of the judgment is sufficient for that purpose, and which brings us to a consideration of the contention that an acquittal should have been directed for the reason hereinbefore stated. Its determination calls for a brief statement of the facts.

Sullins and his wife resided in Knoxville, Tennessee. On July 26, 1939, they left their home in their automobile to visit friends or relatives in or near the town of Kenver, in Harlan County. En route the husband (deceased, David Sullins) and, perhaps, his wife, to some extent, imbibed a considerable quantity of alcohol, and by the time they arrived at Pineville, Kentucky, he was considerably intoxicated. They left Pineville for Harlan, as being a part of their route, but just outside of Pineville they picked up Bill Van Bever, a youth who desired to go to Harlan. Between Pineville and Harlan more drinks were taken by Sullins and by the time he reached the latter city his intoxication had correspondingly increased to such an extent that Van Bever took charge of the wheel and ran the automobile thereafter. They arrived in Evarts about 1 o'clock that night, where they discovered defendant standing near the front of a gasoline station, and from whom they inquired the way to Kenver. He directed them as to the correct road, and inquired if they were going by Shields, another village in the county to which he desired to go, to which inquiry they gave a negative answer. While the automo-

bile was stopped during the inquiry as to the proper route to be taken, Sullins, who was riding on the back seat of the car (his wife and Van Bever occupying the front seat) got out of it and approached defendant— who was but some eight or ten feet distant—with a newly acquired bottle of liquor, and asked him if he desired a drink, but which he declined. Sullins, according to the undoubted proof, was by that time intoxicated to the extent that he had difficulty in walking straight, and was in a more or less maudlin condition. After defendant's declining to take the offered drink Sullins managed to return to the car and placed in it his bottle of liquor, and again approached defendant and asked him the privilege of seeing his pistol which was contained in a scabbard buckled around defendant's waist and plainly visible. Defendant declined to show or deliver it to Sullins, who repeated the request and—according to defendant and other witnesses who claimed to have witnessed the transaction—Sullins then placed his hand on defendant's shoulder. Accepting defendant's version of what happened as corroborated by his two witnesses to the effect that deceased on his last request for defendant's pistol then and there placed his hand on defendant's shoulder, there is no contrariety whatever in the proof up to this point.

Defendant at that juncture was asked: "Q. What did he do? (Meaning, of course, what decedent did after placing his hand on defendant's shoulder). His answer was: "He pulled me toward him." The immediately following examination was to this effect:

"Q. What did you do? A. I backed off and started to shoot.

"Q. How many times did you shoot? A. I shot five times.

"Q. Did you shoot fast or slow? A. Fast.

"Q. Why did you shoot that pistol? A. I figured he was going to kill me."

Dewey Smith, an alleged eyewitness—who was conveniently waiting in the highway between the fatal scene and the end of a bridge spanning a stream, testified to having seen what occurred and he said that "The fellow that got out of the car (Sullins) had his hand on his (defendant's) shoulder, and he turned his left side to

Farley, and either dropped his hand down or put it back behind him. * * * the shooting occurred after he done this.''

He further testified:

'Q. How many shots were fired? A. There were four or five.

''Q. Fast or slow shots? A. They were as fast as a man could pull a gun.''

The testimony uncontradictedly proved that two of the shots entered the back of deceased under the shoulder blade, and which were probably the fatal ones, but whether those wounds were inflicted by the first of the shots fired or by the later ones is not shown.

The deceased as defendant's target was located directly between him and the automobile, upon the front seat of which Mrs. Sullins and Van Bever were sitting, neither of them having gotten out of it. When the shooting was over it was discovered that not only Mr. Sullins but also Mrs. Sullins were both dead, and Van Bever's face was grazed by a bullet from defendant's pistol. The narration that we have given of the proven facts is as strong in defendant's favor as could possibly be made from any of the testimony appearing in the case.

Defendant was 25 years of age and was then married and had a family consisting of his wife and one child. He was old enough to have familiarized himself with the frivolities, the antics, the abnormal conduct and the senseless, though harmless, deportment of one who was in the condition of the deceased on the fatal occasion. He testified that he discovered no evidence of intoxication of deceased, but the evidence is overwhelming to the contrary, and plaintiff's denial of that fact is on a par with his denial that the written statement he made in the hotel did not contain all he stated on that occasion, when it was overwhelmingly proven by witnesses who were present that the statement was written exactly as then given by him. Defendant fled the scene immediately after the shooting, as did also his alleged disinterested eyewitnesses, the latter never going to the scene to render aid to any possible victim of the shooting which they claim to have witnessed. The timely location of the two eyewitnesses at the spot from whence they

might witness the shooting at that late hour of the night was attempted to be accounted for because they were waiting in the highway for the return of some members of a pack of fox hounds engaged in a fox hunt on that night, but they became very much mixed as to the number of absent hounds in giving their testimony, and there were other contradictions as between themselves in the separate narrations given by them respectively.

In discussing the right of self-defense as an excuse for homicide the text in 26 Am. Jur. 241, Section 125, says: "He (defendant) can not carry his right of self-defense to the extent of using a deadly weapon upon his assailant, except where, to his apprehension as a reasonable man, such extreme measures are necessary to save himself from death or great bodily harm," etc. On page 249, Section 137, of the same valume the text says: "The right (of self-defense as an excuse) exists only in extremity, where no other practicable means to avoid the threatened harm are apparent to the person resorting to the right. If there was under the facts of the particular case at bar no real or apparent necessity for the killing, the defense completely fails, and the slayer will be deemed guilty of some grades of culpable homicide." The text then continues by explaining that the necessity for the killing need not have been real, but it will suffice if it appeared to defendant in the exercise of a reasonable judgment to be necessary to kill his antagonist. He cannot, therefore, excuse himself by exercising an unreasonable judgment as to such necessity, when the exercise of a reasonable one would have shown no such necessity. In other words, the accused in such a case may invoke the right of self-defense only as a shield, and not as a haven, or sanctuary. If the reliant on the defense exceeds his rights in attempting to exercise it the defense fails. He will, therefore, not be entitled to it where the circumstances furnished no grounds for belief of impending danger. That rule is a firmly fixed one in the law, and is so stated by all text-writers on criminal law, and is so administered in the trial of all offenses wherein the defense is available. It is likewise approved by all courts, a domestic case in point being Duke v. Commonwealth, 191 Ky. 138, 229 S. W. 122. Many others could be cited of like import, but it is deemed unnecessary, since there is no dissent in the law upon the proposition.

In this case the extremely intoxicated condition of defendant's victim was overwhelmingly established. There is no intimation by defendant, or any other witness who testified at the trial, that the deceased made any threat against defendant, or attempted to strike him or to employ any force whereby he might be endangered. The pestiferous conduct of the victim as well as his actions was but the natural fruitage of his condition. There was no display of belligerency, nor any move or act by deceased indicating an intention to harm defendant, and which he as a reasonable man must have known. Instead of being directed thereby, he, according to his own testimony, stepped back and immediately began shooting. His unguarded and precipitate conduct destroyed the lives of two innocent persons and endangered that of a third one, when neither of the three was offering any harm to him at the time. At any rate, the testimony can well be construed as making an issue for the determination of the jury under proper instructions. That issue was submitted to it in what we have determined to be due form, and it found the existence of no necessity as a proper foundation for the exercise of the right of self-defense, and which we conclude was authorized by the proof adduced at the trial.

Having so concluded, it follows that the court did not err in overruling defendant's motion for a new trial, and the judgment is affirmed.